UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

DANGELO SHAUN LUX,
and LORENZO NETTLES,

        Plaintiffs,

                                    Case No. 20-cv-1057-pp

    v.

CITY OF WHITEWATER,
AARON M. RAAP, ADAM VANDER STEEG,
MIKE ZENS, JUSTIN STUPPY,
RICHARD JOHNSON, and WALWORTH COUNTY,

        Defendants.

**ORDER DENYING DEFENDANT JOHNSON'S MOTION FOR SUMMARY JUDGMENT (DKT. NO. 36) AND DISMISSING DEFENDANT WALWORTH COUNTY**

On December 14, 2020, plaintiffs Dangelo Lux and Lorenzo Nettles filed an amended complaint alleging four claims under 42 U.S.C. §1983 related to their 2018 arrest by police officers from Walworth County and the City of Whitewater. Dkt. No. 29. Police Chief Aaron Rapp, Lieutenant Adam Vander Steeg, Officer Mike Zens and Officer Justin Stuppy all work for the Whitewater Police Department. Richard Johnson is a sheriff's deputy with the Walworth County Sheriff's Department; Kurt Picknell is the Walworth County Sheriff. The plaintiffs have sued Vander Steeg, Zens and Stuppy for violations of the Equal Protection Clause of the Fourteenth Amendment, and excessive force and false arrest in violation of the Fourth Amendment. They have sued Vander Steeg, Zens, Stuppy and Johnson for failure to intervene. They have sued the City of

1

Whitewater and Rapp on a <u>Monell</u>[1] claim that the City had a policy, practice or custom of condoning excessive force and other civil rights violations.

Johnson and Walworth County have filed a joint motion for summary judgment.[2] Dkt. No. 36. The City of Whitewater, along with defendants Raap, Vander Steeg, Zens and Stuppy, separately have filed a joint motion for summary judgment, dkt. no. 40, which the court will address in a separate order.

## I.    Facts

Plaintiffs Dangelo Lux and Lorenzo Nettles were adult residents of Wisconsin at the time of the relevant events. Dkt. No. 29 at ¶¶5-6. Richard Johnson has been a police officer for roughly twenty-four years, eleven years as a patrol officer with the Palmyra Police Department and thirteen years as a patrol deputy with the Walworth County Sheriff's Office. Dkt. No. 65 at ¶¶1-2. Johnson had never encountered the plaintiffs prior to the events described in the amended complaint. <u>Id.</u> at ¶3.

The plaintiffs' proposed findings of fact recount their version of the events that occurred in the early morning hours of September 20, 2018. The parties do not dispute that Johnson was not present for most of what happened that night, but some background is helpful. Docket number 70

---

[1] <u>Monell v. Dep't of Soc. Services of City of New York</u>, 436 U.S. 658 (1978).

[2] When the plaintiffs amended their complaint, they removed claims against Walworth County Sheriff Picknell and Walworth County; the county remains a named defendant because the plaintiffs maintain that the county is liable under Wis. Stat. §895.46 for any judgments taken against Johnson. Dkt. No. 29 at 2 n.1.

contains the plaintiffs' version of events and the defendants' objections. It is undisputed that in the wee hours of September 20, 2018, the plaintiffs were leaving a bar in Whitewater when people across the street began yelling at Lux; Lux recognized them as people who'd assaulted him the previous week. Lux yelled back at them, but there was no physical altercation. A Whitewater police officer arrived during the yelling exchange and approached Lux (who admits he'd been drinking but was of age and wasn't driving that night). Lux told the officer that the individuals across the street previously had assaulted him; the officer asked Nettles to walk Lux home and Nettles agreed.

As Lux and Nettles walked home, they encountered a former football teammate of Lux's named Jack Piper. As the group was talking, Whitewater officer Adam Vander Steeg approached in a squad car. The events that unfolded over the next few minutes are the subject of the dispute at the heart of the lawsuit—the plaintiffs allege that Vander Steeg and eventually other Whitewater officers stopped them for no reason and used excessive force in detaining and arresting them. Vander Steeg and the other Whitewater officers say that Vander Steeg stopped because he saw the men pushing each other and that the plaintiffs failed to comply with lawful police orders and resisted officers.

Just after 2:00 a.m. on September 20, 2018, Johnson was on patrol in the city of Whitewater when he heard Vander Steeg report over his dispatch radio that he needed support with three males behind the police department. Dkt. No. 65 at ¶¶4-5. The defendants assert that Vander Steeg stated over the

radio that the three males were pushing each other; the plaintiffs insist that no one was pushing anyone. Id. at ¶5 (citing dkt. no. 35-1 at 5). The "call detail report" logged by Johnson with Walworth County summarizes the call:

> Observed Lt Vandersteeg [sic] on radio requesting an additional unit and then an emergency response and responded to Freemont at Center St. Observed him and Officer Zens with two male subjects, one cuffed on ground and the other resisting Zens. 2 other males were close and I requested they stay back and then assisted Zens in finishing cuffing subject. Stood by while other was search[ed] and assisted to his feet and all were placed in the rear of squads in custody and I cleared. R. Johnson.

Id. at ¶6 (quoting dkt. No. 35-1 at 19). The plaintiffs dispute that Nettles was resisting Officer Mike Zens. Id. (citing dkt. no. 63 at ¶¶42-51).

Johnson estimates that he arrived at the scene less than a minute after receiving the radio call and was wearing a body camera which he believes he turned on when he activated his squad car's emergency lights while in transit. Id. at ¶¶7-8. The camera stayed activated for the duration of Johnson's presence on the scene, id. at ¶9, but was muted for a portion of the video after the plaintiffs had been placed in police cars, dkt. no. 61-3 at 5:24-7:7:12. The video is seven and a half minutes long, but it appears that Johnson did not arrive on scene until about forty-one seconds into the recording. Dkt. No. 61-3 at 00:41. Because the camera was mounted on Johnson's chest rather than his head, it did not necessarily record what his eyes saw in real time. Dkt. No. 65 at ¶11.

At the time Johnson arrived, Vander Steeg and Zens were the other officers present. Id. at ¶13. Johnson had no knowledge about what had transpired between the plaintiffs and the Whitewater officers before his arrival

4

there. Id. at ¶15. When Johnson arrived, Lux was handcuffed with his chest on the ground and Vander Steeg standing next to him. Id. at ¶13. The body cam footage shows that as Johnson approached, Lux was on the ground behind a squad car, on his stomach and facing directly down at the ground so that only the top and back of his head were visible. Dkt. No. 61-3 at 1:06-1:10. Nettles was standing up, facing the right side of the squad car with his front body against it and an officer (Zens) immediately behind him. Id. Almost immediately, an unidentified individual holding a box of Goldfish crackers is seen moving toward Nettles; Johnson rushes up and orders the individual to stand back. Dkt. No. 65 at ¶14; dkt. no. 61-3 at 1:10-1:20.

As Johnson was moving toward the unidentified individual, Johnson's video recorded Nettles turning 180° away from Zens, from facing the squad car to facing the sidewalk, and taking a step onto the curb before Zens grabbed him and turned him back toward and up against the vehicle. Id. The plaintiffs insist that Johnson saw Zens "slam" Nettles's face into the squad car, citing the body cam footage as support. Dkt. No. 70 at ¶80. The plaintiffs also say that Nettles's face made contact with the car and that the contact was "so forceful that Nettles['s] glasses fell off his face and his front tooth chipped in half." See id. at ¶69. The defendants respond that it is "clear" from the body cam footage that Nettles's head was not "smashed" into the squad car. Id.

After Johnson had moved the unidentified man away from the scene, he helped Zens place Nettles in handcuffs. Dkt. No. 65 at ¶16. Nettles was facing the passenger side of the car as Johnson held Nettles's right arm. Id. Johnson

5

noticed that Nettles's glasses were not on his face, although Johnson did not know when or how they fell off. Id. at ¶¶17-18. The plaintiffs assert that the glasses fell off when Zens allegedly "slammed" Nettles's head into the car. Id. at ¶17. Johnson says that Nettles never pulled his arm away from Johnson's hold and that "the initial resistance Nettles exhibited with Officer Zens, if any, had occurred before Deputy Johnson was next to Officer Zens and Nettles." Id. at ¶19. The plaintiffs insist that Nettles did not resist Zens at any point. Id. At some point while Johnson was holding Nettles's right arm, Vander Steeg assisted with Nettles—"controlled the left side of Nettles"—for roughly thirty seconds, but Johnson says he knows that from reviewing the video and not from seeing it in real time. Id. at ¶¶20, 21, 23. Johnson says that Nettles's head never was slammed into the car while he was holding onto Nettles's arm. Id. at ¶24. The plaintiffs, again citing the video, insist that Johnson saw Zens slam Nettles's head into the squad car "when [Johnson] was mere feet away." Id.

At Nettles's request, Johnson found Nettles's glasses on the ground near where Nettles was standing; Johnson picked them up and placed them back on Nettles's face. Id. a ¶25. Nettles told Johnson to look at his chipped tooth, id. at ¶26; Johnson's body cam video recorded Nettles demanding that Johnson look at his tooth and showing it to Johnson, dkt. no. 61-3 at 1:55-2:01. Johnson says that he did not have any knowledge about Nettles's chipped tooth, but the plaintiffs insist that he should have known because the "slam" occurred while he was a few feet away. Id.

Johnson then moved over to where Vander Steeg was standing next to Lux. Id. at ¶27. The body cam footage shows that Lux was lying on his side as Vander Steeg was searching his pockets. Dkt. No. 61-3 at 2:23-2:34. Vander Steeg told Lux to roll the other way, Lux said "no," and Vander Steeg told him more forcefully to roll the other way. Id. at 2:34-2:37. Lux rolled to his side, holding his head up and saying "ow" as Vander Steeg tells him to roll back; when Lux does not roll back, Vander Steeg says that he is resisting and Lux says that he is not. Id. at 2:37-2:59. The body cam footage shows Lux rolling back and forth, with his face passing through a puddle of rainwater each time. Id.

Johnson placed a hand on Lux to help roll Lux onto his stomach as Vander Steeg searched Lux; he says the search took approximately thirty seconds. Id. at ¶28. Johnson estimates that he saw Lux's face in the puddle for roughly one second. Id. at ¶29 (citing dkt. no. 61-3 at 2:47-2:50; dkt. no. 35-1 at 8). The plaintiffs insist that that Lux's face was in the puddle, and that he was struggling to breathe, from the time Johnson arrived on scene until Lux was lifted to his feet after being rolled over and searched. Id. (citing dkt. no. 61-3 at 1:06-3:17). Vander Steeg and Johnson helped lift Lux up off the ground and Vander Steeg placed him into the police car. Dkt. No. 65 at ¶¶30-31; Dkt. No. 61-3 at 3:25- 3:52. The video shows a patch of raw, bleeding skin on Lux's right elbow. Id. at 3:27-3:28. Johnson then picked Lux's hat up off the ground and placed it on the seat next to Lux. Dkt. No. 65 at ¶33.

After helping to get Lux into the police car, Johnson spoke with Vander Steeg and Zens for several minutes. Id. at ¶34. During this conversation, Johnson turned off the microphone to his body camera. Dkt. No. 61-3 at 5:24-7:7:12. Johnson then left the scene. Dkt. No. 65 at ¶35.

Johnson never saw Vander Steeg or Zens with their tasers out or drawn while he was present at the scene. Id. at ¶36. Nor did he see Vander Steeg take Lux to the ground. Id. at ¶37. Johnson has "gone through basic academy, firearm instructor training, some munitions training, field officer training, mobile field force training for special events, and sustainment training throughout the years," including twenty-four hours of annual sustainment training. Id. at ¶38-39.

## II.    Motion for Summary Judgment

A.    Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Federal Rule of Civil Procedure 56(a). "Material facts" are those that, under the applicable substantive law, "might affect the outcome of the suit." See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute over a material fact is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

A moving party "is 'entitled to a judgment as a matter of law'" when "the nonmoving party has failed to make a sufficient showing on an essential

8

element of [its] case with respect to which [it] has the burden of proof." Celotex

Corp. v. Catrett, 477 U.S. 317, 323 (1986). Still,

> a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.

Id. (internal quotation marks omitted).

To determine whether a genuine issue of material fact exists, the court

must review the record, construing all facts in the light most favorable to the

nonmoving party and drawing all reasonable inferences in that party's favor.

See Heft v. Moore, 351 F.3d 278, 282 (7th Cir. 2003) (citing Liberty Lobby, 477

U.S. at 255). "However, [the court's] favor toward the nonmoving party does not

extend to drawing inferences that are supported by only speculation or

conjecture." Fitzgerald v. Santoro, 707 F.3d 725, 730 (7th Cir. 2013) (quoting

Harper v. C.R. Eng., Inc., 687 F.3d 297, 306 (7th Cir. 2012)). That is, "to

survive summary judgment, the non-moving party must establish some

genuine issue for trial 'such that a reasonable jury could return a verdict' in

her favor." Fitzgerald, 707 F.3d at 730 (quoting Makowski v. SmithAmundsen

LLC, 662 F.3d 818, 822 (7th Cir. 2011)).

Section 1983 of Title 42 allows a person to sue anyone who, "under color

of" state law, deprives that person of his constitutional rights. "To prevail on a

§ 1983 claim, the plaintiff must prove 'that: (1) he was deprived of a right

secured by the Constitution or laws of the United States; and (2) the

deprivation was visited upon him by a person or persons acting under color of

9

state law.'" Bohanon v. City of Indianapolis, 46 F.4th 669, 675 (7th Cir. 2022) (quoting Buchanan-Moore v. Cty. of Milwaukee, 570 F.3d 824, 827 (7th Cir. 2009)).

B.    Parties' Arguments

The defendants argue that no reasonable jury could find that Johnson failed to intervene in any other officer's use of excessive force. Dkt. No. 37 at 1-2. They assert that the body cam footage and the deposition testimony demonstrate that Johnson is entitled to qualified immunity and that no reasonable jury could consider awarding punitive damages. Id. at 2. They argue that Walworth County does not become a defendant solely because it has a statutory duty to indemnify its employees under Wis. Stat. §895.46. Id.

The defendants begin by arguing that if the court finds that Vander Steeg and Zens did not use excessive force (or that if they did, they did not use excessive force in his presence), Johnson cannot be held liable as a matter of law because there was no constitutional violation for him to try to prevent. Id. at 8 (citing Gill v. City of Milwaukee, 850 F.3d 335, 342 (7th Cir. 2017); Fillmore v. Page, 358 F.3d 496, 505-06 (7th Cir. 2004)). They maintain that the plaintiffs must show more than that Johnson was on the scene when an unconstitutional act was committed—they must show that he had a realistic opportunity to stop it, a tough task under rapidly unfolding circumstances. Id. The defendants argue that the body cam footage and sworn testimony show that Johnson did not observe any officer use excessive force beyond *de minimis* contacts. Id. at 8-9. They point out that Lux was already handcuffed and on

10

the ground when Johnson arrived and that Nettles was in the process of being handcuffed "which did not involve any physical struggle with the officers." Id. at 9. They emphasize that Johnson did not know how Lux was taken to the ground or how Nettles's glasses came off or how he chipped his tooth. Id. The defendants assert that it wasn't possible for Johnson to intervene to prevent force that occurred before he arrived, and that because Johnson had no knowledge of what happened before he arrived, it would have been "patently unreasonable" for him to intervene due to the potential for risk to officer safety. Id.

Alternatively, the defendants assert that Johnson is entitled to qualified immunity. Id. at 10. They argue that the law was not clear as of September 20, 2018 "that a law enforcement officer in Deputy Johnson's position was required to show up as an assisting officer on scene and begin undoing arrests and intervening in other officers' completion of arrests, particularly where no active force was being used." Id. at 11-12. They emphasize that Johnson had twenty-four-years' worth of experience and training, none of which caused him to believe that the Whitewater officers did anything wrong; the defendants maintain that Johnson would have intervened if he felt he'd witnessed misconduct. Id. at 12. The defendants argue that body camera footage supports that there was no excessive force used while Johnson was present, and that even if he mistakenly believed that he did not see other officers use excessive force, he was reasonable "in believing that he did not witness other officers use excessive force." Id.

The defendants also argue that the plaintiffs' punitive damages claim fails as a matter of law. Id. They argue that "[p]unitive damages are only recoverable in Section 1983 actions where the defendant had a reckless or callous disregard to the federally protected rights of others." Id. (citing Smith v. Wade, 461 U.S. 30, 35, 51 (1983); Woodward v. Correctional Med. Servs. Of Ill., Inc., 368 F.3d 917, 930 (7th Cir. 2004)). The defendants assert that the plaintiffs are unable to show that Johnson had evil motivation or reckless or callous indifference to their rights. Id. at 13. They point to the body camera footage showing Johnson picking up Nettles's glasses and placing them back on his face as well as helping to lift Lux from the ground and retrieving his hat from a puddle. Id.

Finally, regarding the plaintiff's claim that Walworth County is "liable" under Wis. Stat. §895.46, the defendants argue that Wis. Stat. §895.46 does not create a private right of action; it simply provides for the county to pay damages on behalf of an employee who is found liable. Id. at 14.

The plaintiffs concede that the court should dismiss Walworth County as a defendant. Dkt. No. 67 at 1 n.1 But they argue that the "combined video footage from officer body cameras" shows that other than initially walking a few steps away from Vander Steeg at the outset of the incident, neither plaintiff ever resisted. Id. at 7. They argue that Vander Steeg kept Lux's face in a puddle of water and that Lux struggled to breathe. Id. They assert that "Johnson was at the scene for well over a minute before he assisted with lifting Lux out of the water." Id. They assert that any significant force was excessive because Lux

was not resisting. Id. at 7 (citing Alicea v. Thomas, 815 F.3d 283, 288-89 (7th Cir. 2016)). They argue that viewed in the light most favorable to them, Vander Steeg's conduct constituted an obvious violation of Lux's constitutional rights that "any state actor would know was a violation." Id. at 8.

The plaintiffs assert that Johnson's body cam footage shows Lux "breathing into the puddle and Vander Steeg rolling him further into the puddle." Id. They assert that the footage shows that Johnson was "standing over Lux as Johnson's entire foot is [submerged] in the puddle," but that Johnson did not either stop Vander Steeg from rolling Lux further into the puddle or remove Lux from the puddle. Id.

As to Nettles, the plaintiffs argue that Johnson's body camera shows that Nettles did not make any quick or sudden moves, and that it "shows Zens slamming Nettles into the squad car." Id. They claim that the video shows "that Nettles may have tried to slowly step out of the gutter, that had over an inch of water, and back on to the curb," but that it does not show Nettles trying to move his arms away from Zens and does not show him actively resisting. Id. at 9. The plaintiffs insist that "slamming" a person's head into a squad car so hard that it chips the person's front tooth in half constitutes significant force. Id. They argue that this force was not justified because Nettles was not resisting. Id.

The plaintiffs assert that Johnson had a realistic opportunity to prevent the excessive force used against both plaintiffs. Id. at 9. They first say that he failed to assist Lux out of the puddle "where he was struggling to breath[e]." Id.

They next say he stood by as Vander Steeg rolled Lux further into the puddle and that Johnson's foot was entirely submerged "in the puddle Lux's face was in." Id. at 9-10. The plaintiffs argue that "Johnson stood over Lux for approximately 40 seconds as Lux took in and spit out water. . . . At any point during these 40 seconds, Johnson could have stopped or instructed Vander Steeg to remove Lux's face from the puddle." Id. at 10. They contend that Johnson's body camera footage "clearly shows Lux struggling to breathe and within an arm's reach of Johnson." Id.

Similarly, the plaintiffs argue that Johnson had the opportunity to "intervene or stop Zens from slamming Nettles['s] head into the squad car and instead grabbed Nettles['s] arm." Id. They say that Johnson's body cam footage shows "Zens aggressively take control of Nettles at the time Johnson started running," and that Johnson was "within arms reach within seconds." Id. The plaintiffs assert that when Zens "grabbed Nettles aggressively," Johnson did not intervene "or deter Zens verbally." Id. While conceding that the incident unfolded quickly, the plaintiffs maintain that "Johnson was in a position to see what was about to occur and failed to stop it despite having the opportunity to." Id. The plaintiffs argue that Johnson wasn't required to grab and restrain Zens; they say he could have warned or dissuaded Zens. Id.

The plaintiffs dispute that Johnson is entitled to qualified immunity. Id. at 11. They argue that Johnson saw a non-resistant Lux face-down in a puddle for over a minute and saw a non-resistant Nettles slammed face-first into "the cop car." Id. at 11. They insist that any state actor would have known these

14

were violations. Id. at 12. They maintain that Johnson could see that Lux was "struggling to breathe in a puddle of water" and argue that "[a]ny reasonable officer would have seen Lux struggling to breathe, not resisting, and assisted him out of the puddle ending his suffering." Id.

Finally, the plaintiffs argue that punitive damages are a question for the jury. Id. at 13 (citing Coulter v. Vitale, 882 F.2d 1286, 1289 (7th Cir. 1989)). They insist that "[a] jury could easily conclude that this type of behavior amounts to callous disregard of Lux and Nettles protected rights." Id.

The defendants' reply focuses on what Johnson was able to see given the timing of his arrival. They reiterate that Johnson arrived on the scene after Lux had been taken to the ground and when Nettles already was up against the squad car. Dkt. No. 69 at 2. They reiterate that he did not know what had happened before he arrived, so he did not know why other officers had Lux on the ground and handcuffed or why they had Nettles against the squad being cuffed. Id. The defendants disagree with the plaintiffs' interpretation of Johnson's body camera footage, arguing that the plaintiffs' version is unsupported and insufficient to overcome summary judgment. Id. (citing Han v. Whole Foods Market Group, Inc., 44 F. Supp. 769, n.14 (N.D. Ill. 2014)). They assert that it is "clear" from Johnson's body camera footage "that Nettles' head was not 'slammed' into the vehicle at the time Deputy Johnson was present and observing Nettles." Id. They say that to the extent any force was used on Nettles, the body camera footage shows that Johnson was speaking to the unidentified individual while it was happening, and they say it would have

15

happened when Johnson first arrived and didn't have any information about the circumstances. Id. at 3.

The defendants argue that the plaintiffs contradict themselves—they argue both that Johnson saw Zens slam Nettles's face into the squad car and knock his glasses off *and* concede that Johnson did not see Nettles's glasses fall off and did not know when that happened. Id. They indicate that the plaintiffs do not dispute that the body cam footage does not necessarily reflect what Johnson was seeing in real time. Id. The defendants argue that the plaintiffs have not identified a specific moment in Johnson's body cam footage where the alleged "slamming" of Nettles's head into the car occurred. Id. at 4. They maintain that Johnson was near Lux while Lux's head was in the puddle for six seconds at the most. Id. at 4-5.

The defendants make a similar argument regarding qualified immunity. Dkt. No. 5-6. They point out that several of the facts the plaintiffs claim Johnson was aware of occurred before Johnson arrived on the scene and are not captured on the body cam footage. Id. at 6. They argue that whether Nettles was resisting is irrelevant, because Johnson was talking to a bystander when Nettles allegedly was pushed up against the squad car. Id. at 6 (citing Felton v. Teel Plastics, Inc., 724 F. Supp. 2d 941, 958 (W.D. Wis. 2010)). The defendants argue that it was not feasible for Johnson to intervene even if an officer had used excessive force used at that moment. Id. at 6-7.

Responding to the plaintiffs' argument on punitive damages, the defendants repeat their original argument. Id. at 7-8.

C.    Analysis

1.    *Failure to Intervene*

To succeed on a claim for failure to intervene, the plaintiffs must show

that the defendant "(1) knew that a constitutional violation was committed; and

(2) had a realistic opportunity to prevent it." Gill, 850 F.3d at 342 (citing Yang

v. Hardin, 37 F.3d 282, 285 (7th Cir. 1994)). "[A] 'realistic opportunity' means a

chance to warn the officer using excessive force to stop." Miller v. Gonzalez,

761 F3d 822, 826 (7th Cir. 2014) (citing Abdullahi v. City of Madison, 423

F.3d. 763, 774 (7th Cir. 2005)). The Seventh Circuit has "implied that a

'realistic opportunity to intervene' may exist whenever an officer could have

'called for backup, called for help, or at least cautioned [the excessive force

defendant] to stop.'" Abdullahi, 423 F.3d at 774 (quoting Yang, 37 F.3d at 285).

> Perhaps more crucially, [the Seventh Circuit] has made clear that
> the prongs of this analysis almost always implicate questions of fact
> for the jury: "Whether an officer has sufficient time to intervene or
> was capable of preventing the harm caused by another officer is
> generally an issue for the trier of fact unless, considering all the
> evidence, a reasonable jury *could not possibly conclude otherwise*."
> *Lanigan v. Village of East Hazel Crest, Ill.*, 110 F.3d 467, 478 (7th
> Cir. 1997) (emphasis added).

Id.

In a separate order, the court has denied Vander Steeg and Zenz's

motion for summary judgment on the plaintiffs' excessive force and failure-to-

intervene claims. It has concluded that a reasonable jury could view the body

cam footage, hear the testimony and reach the conclusion that Vander Steeg

17

used excessive force against Lux and that Zens used excessive force against Nettles.

By the time Johnson arrived on the scene, Lux was handcuffed and lying face down on his stomach in the rain. In the brief glimpse caught by Johnson's body camera, Lux is not moving and does not appear to be struggling; he is lying still. While others' body cam footage shows that there were times during the September 20, 2018 incident when Lux's face was in a gutter filled with rainwater, it is difficult to determine—at least for this viewer—whether Lux's face was in water when Johnson arrived. His body camera footage shows that Lux was face-down; one can see only the top and back of his head. But when he arrived, Johnson moved quickly past Lux and Vander Steeg, toward and past the squad car against which Zens had Nettles. There seems to be no dispute that as Johnson moved toward the squad car, Nettles stepped away from the car and onto the curb, then was returned by Zens to face the car. But just how Zens returned Nettles to face the car—with what level of force—is not clear from the video footage. The plaintiffs insist that the video shows Zens "slamming" Nettles's face into the squad car. The defendants insist that the video shows that Zens did not slam Nettles's face into the squad car. The video is not as clear as either party would have it, perhaps because the camera was mounted on Johnson's chest and Johnson seems to have been focused on keeping the unidentified man with the carton of Goldfish crackers away from the officers and the plaintiffs.

18

Johnson stated at his deposition that Nettles was "pulling his arm away" from Zens. Dkt. No. 35-1 at 6, Tr. Page 20 at lines 2-8. The plaintiffs insist that did not happen. The video footage does not clarify the issue. Johnson testified at the deposition that he did not see Nettles's glasses come off. Id. at 7, Tr. Page 24, lines 8-25. The plaintiffs do not seem to dispute that, although they insist that Johnson had to have seen the "slam" that allegedly caused Nettles's glasses to come off.

After Nettles was cuffed, Johnson went behind the squad car, where Lux was on the ground and Vander Steeg was searching his pockets. The plaintiffs insist that Lux's face was in the water and that he was struggling to breathe the entire time Johnson was present. The video shows this was not true—when Johnson went to the back of the squad after Nettles had been cuffed, Lux was on his side, not face down. The video does show, however, that Vander Steeg either ordered Lux to roll from one side to the other, or rolled him from one side to the other, more than once as Johnson stood there. When Vander Steeg first directs Lux to roll to the other side, Lux does not comply. Vander Steeg orders him more forcefully; Lux does not comply, and the camera shows him on his side, saying what sounds like "ow" and breathing. Vander Steeg asserts that Lux is resisting, Lux replies that he is not and says something unintelligible as he either rolls or is rolled onto his stomach and over to his other side. As he comes up to the other side, he is blowing air and water out of his mouth. There is another roll before Vander Steeg and Johnson help Lux into a sitting position and then to standing.

The defendants are correct that the plaintiffs' argument that Vander Steeg required Lux to have his face down in the water for ten minutes has little bearing; even if that were true, Johnson could not have known that because he was not on the scene for ten minutes. Johnson could not have known whether Vander Steeg or anyone else forced Lux to the ground. But for the three to three-and-a-half minutes or so that Johnson was present, Lux either was ordered to roll or was rolled from his side to his stomach with his face going into the water more than once. Johnson did not suggest that Vander Steeg allow Lux to sit up or stop rolling him face-first through the water.

Viewing the facts in the light most favorable to the plaintiffs, the court cannot conclude as a matter of law that there is no genuine dispute as to whether Johnson failed to intervene. The parties dispute whether Nettles was resisting when Johnson arrived on the scene. They dispute whether Zens slammed Nettles into the squad car and, if so, whether Johnson saw it. They dispute whether Vander Steeg forced Lux to lie with his face in the water, whether that constituted excessive force under the circumstances and whether Johnson was aware of it and could have intervened. The events unfolded quickly. The body camera footage is not definitive. A reasonable jury could review all of the evidence and testimony and conclude that Vander Steeg and Zens used excessive force while Johnson was on the scene, that he had reason to know it and that he had the opportunity to intervene. A jury should make that determination.

        2.    *Qualified Immunity*

"Qualified immunity shields a government official from suit when the official is performing a discretionary function and his conduct does not violate clearly established rights of which a reasonable person would have known." Sutterfield v. City of Milwaukee, 751 F.3d 542, 572 (7th Cir. 2014). "To be 'clearly established,' a constitutional right 'must have a sufficiently clear foundation in then-existing precedent.'" Campbell v. Kallas, 936 F.3d 536, 545 (7th Cir. 2019) (quoting District of Columbia v. Wesby, 138 S. Ct. 577, 589 (2018)). "Qualified immunity applies unless the specific contours of the right 'were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it.'" Id. (quoting Plumhoff v. Rickard, 572 U.S. 765, 778-79 (2014)). Clearly established law "cannot be framed at a 'high level of generality.'" Id. (quoting Ashcroft v. al-Kidd, 563 U.S. 731, 742 (2011)).

> Whether qualified immunity applies turns on two questions: First, whether the facts presented, taken in the light most favorable to the plaintiff, describe a violation of a constitutional right; and second, whether the federal right at issue was clearly stablished at the time of the violation. *Tolan v. Cotton*, 572 U.S. 650, 655-56 . . . . (2014) (per curiam). These questions may be addressed in either order. *Jones* [*v. Clark*], 630 F.3d [677] at 682 [7th Cir. 2011]] (citing *Pearson v. Callahan*, 555 U.S. 223, 236-43 . . . (2009)). 'If *either* inquiry is answered in the negative, the defendant official is protected by qualified immunity." *Koh v. Ustich*, 933 F.3d 836, 844 (7th Cir. 2019) (citation and internal quotation marks omitted).

Smith v. Finkley, 10 F.4th 725, 737 (7th Cir. 2021).

"The question of a defendant's qualified immunity is a question of law for the court, not a jury question." Id., 10 F.4th at 734 (quoting Warlick v. Cross, 969 F.2d 303, 305 (7th Cir. 1992)).

The court has concluded that the facts, viewed in the light most favorable to the plaintiffs, describe a possible violation of a constitutional right—the failure to intervene to prevent the use of excessive force. As to whether that constitutional right was clearly established at the time of the incident, the court must determine whether "precedent squarely governs the facts at issue, mindful that [it] cannot define clearly established law at too high a level of generality." Id. at 742 (quoting Strand v. Minchuk, 910 F.3d 909, 917 (7th Cir. 2018)). In excessive force cases, defining the "clearly established right" with specificity is important, "as it can be difficult to determine how the law on excessive force will apply to a factual situation," given the heavily fact-intensive nature of excessive force claims. Id. An official "cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." Kisela v. Hughes, ___ U.S. ___, 138 S. Ct. 1148, 1153 (2018) (quoting Plumhoff, 134 S. Ct. at 2023).

Since at least 2007, it has been clearly established that "a police officer may not use excessive force in arresting an individual." Holmes v. Vill. of Hoffman Estate, 511 F.3d 673, 687 (7th Cir. 2007). Since at least 1995, it has been clearly established "that using a significant level of force on a non-resisting or a passively resisting individual constitutes excessive force." Alicea v. Thomas, 815 F.3d 283, 292 (7th Cir. 2016) (citing Rambo v. Daley, 68 F.3d 203, 207 (7th Cir. 1995)). See also Miller v. Gonzalez, 761 F.3d 822, 829 (7th

Cir. 2014) ("the law is clearly established that police officers cannot use 'significant' force on suspects who are only passively resisting arrest").

While there are genuine disputes as to whether the evidence shows that Johnson was aware of either Vander Steeg or Zens using excessive force and, if so, whether he could have intervened, the court concludes that the law was clearly established that Vander Steeg and Zen could not use excessive force in effecting an arrest, that the record contains evidence indicating that they may have done so, that there is evidence that Johnson may have witnessed the use of force and that he did not intervene. Johnson is not entitled to qualified immunity.

### 3. *Punitive Damages*

"In an action under § 1983, 'a jury may be permitted to assess punitive damages . . . when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others.'" Green v. Howser, 942 F.3d 772, 781 (7th Cir. 2019) (quoting Smith v. Wade, 461 U.S. 30, 56 (1983)).

The court agrees with the defendants that Johnson's tone at the scene was reasonable and friendly. But it will not, at this stage, prohibit the plaintiffs from seeking punitive damages. If a jury concludes that Johnson was aware that Vander Steeg or Zens were using excessive force but did not intervene, his friendly tone may not preclude the jury from also concluding that he acted with callous indifference.

### III. Conclusion

The court **DENIES** defendant Johnson's motion for summary judgment. Dkt. No. 36.

The court **FINDS** that defendant Johnson is not entitled to qualified immunity. Dkt. No. 36.

The court **ORDERS** that defendant Walworth County is **DISMISSED**.

The court will schedule a status conference to confer with the parties about the next steps in the case.

Dated in Milwaukee, Wisconsin this 28th day of September, 2022.

**BY THE COURT:**

**HON. PAMELA PEPPER**
**Chief United States District Judge**

Case 2:20-cv-01057-PP    Filed 09/28/22    Page 24 of 24    Document 75