UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

DANGELO SHAUN LUX,
and LORENZO NETTLES,

             Plaintiffs,

                                          Case No. 20-cv-1057-pp

      v.

CITY OF WHITEWATER,
AARON M. RAAP, ADAM VANDER STEEG,
MIKE ZENS, JUSTIN STUPPY,
WALWORTH COUNTY, and RICHARD JOHNSON,,

             Defendants.

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS CITY OF WHITEWATER, RAAP, VANDER STEEG, ZENS AND STUPPY'S MOTION FOR SUMMARY JUDGMENT (DKT. NO. 40) AND DISMISSING DEFENDANTS CITY OF WHITEWATER, RAAP AND STUPPY**

On December 14, 2020, the plaintiffs filed an amended complaint alleging four claims under 42 U.S.C. §1983 related to their 2018 arrest by police officers from Walworth County and the City of Whitewater. Dkt. No. 29. Police Chief Aaron Rapp, Lieutenant Adam Vander Steeg, Officer Mike Zens and Officer Justin Stuppy all work for the Whitewater Police Department. Id. at ¶¶8-11. The plaintiffs, Dangelo Lux and Lorenzo Nettles, have sued Vander Steeg, Zens and Stuppy for violations of the Equal Protection Clause of the Fourteenth Amendment, and excessive force and false arrest in violation of the Fourth Amendment. They have sued Vander Steeg, Zens, Stuppy and Walworth County Deputy Sheriff Richard Johnson for failure to intervene. They have

1

sued the City of Whitewater and Rapp on a <u>Monell</u>[1] claim that the City had a policy, practice or custom of condoning excessive force and other civil rights violations.

The City of Whitewater, along with defendants Raap, Vander Steeg, Zens and Stuppy, have filed a joint motion for summary judgment. Dkt. No. 40. The court will grant in part and deny in part their motion.

Defendants Richard Johnson and Walworth County also have filed a motion for summary judgment, dkt. no. 37, which the court addresses in a separate order.

## I. Facts

The parties heavily dispute what occurred on the night the plaintiffs were arrested. They tell significantly different stories about what occurred during the plaintiffs interaction with officers. Some, but not all, of the night is captured on the officers' body camera footage.

### A. The Parties

The plaintiffs are both Black males residing in Wisconsin. Dkt. No. 72 at ¶¶1-2. The defendants assert that Lux was a defensive lineman for the University of Whitewater and was listed by the University as being six feet, one inch tall and weighing 280 pounds. <u>Id.</u> at ¶16.

The defendants include two municipalities and law enforcement officers working for those municipalities. The City of Whitewater and Walworth County are municipalities in the state of Wisconsin. <u>Id.</u> at ¶¶3, 8. Aaron Rapp is the

---

[1] <u>Monell v. Dep't of Soc. Services of City of New York</u>, 436 U.S. 658 (1978).

2

police chief of the Whitewater Police Department and Adam Vander Steeg is a lieutenant for the WPD. Id. at ¶¶4-5. Mike Zens and Justin Stuppy both are WPD police officers. Id. at ¶¶6-7. Richard Johnson is an officer with the Walworth County Sheriff's Department; Kurt Picknell is the Sheriff of Walworth County. Id. at ¶¶9-10.[2]

B.    Plaintiffs' First Interaction with Police

The events occurred in the rainy, early morning hours of September 20, 2018, as the plaintiffs were leaving a bar in Whitewater, Wisconsin. Dkt. No. 73 at ¶1; dkt. no. 72 at ¶14. Lux had consumed alcohol that night. Dkt. No. 72 at ¶17. The defendants say that his speech was slurred, id. (citing dkt. no. 46-1 at 23; dkt. no. 42-1 at 0:30-5:00), which the plaintiffs deny, id. (citing dkt. no. 42-1 at 0:30-5:00). The defendants assert that preliminary breath test taken some time later indicated that Lux was over the legal limit; the plaintiffs respond that he was not driving and of legal age. Dkt. No. 72 at ¶18.[3]

Around 1:52 a.m., officers—including Vander Steeg, Zens and Stuppy—first encountered the plaintiffs. Id. at ¶13. A group of individuals began shouting at Lux as the plaintiffs were exiting the bar, and Lux—recognizing the group as people who had assaulted him earlier that week—yelled back. Dkt. No. 73 at ¶¶2, 4-5. No violent physical altercation occurred at this time, and

_____

[2] When the plaintiffs amended their complaint, they removed claims against Sheriff Picknell and Walworth County; the county remains a named defendant because the plaintiffs maintain that the county is liable under Wis. Stat. §895.46 for any judgments taken against Johnson. Dkt. No. 29 at 2 n.1.

[3] The defendants' reply brief (dkt. no. 72) contains two paragraphs numbered 18; this reference is to paragraph 18 on page 6.

3

the plaintiffs never were on the same side of the street as the group, but the Whitewater police officers arrived on the scene as the plaintiffs and the other group were yelling. Id. at ¶¶6-9. The defendants assert that the first officer on the scene, Sergeant Martin, had to separate Lux from another individual that the plaintiffs had been fighting,[4] dkt. no. 72 at ¶15 (citing dkt. no. 46-1 at 15), but they also agree with the plaintiffs' assertion that Lux never had to be separated from the other individuals and that Lux and Nettles remained across the street from the people at whom they yelled, dkt. no. 73 at ¶8. The officers approached Lux regarding the confrontation and requested Lux's driver's license, which he provided. Id. at ¶¶9-11. The defendants state that, while Martin was checking Lux's identification, Lux continued yelling and pushed his friends, who were trying to intervene. Dkt. No. 72 at ¶¶20-21 (citing dkt. no. 42-1 at 1:30-2:30; dkt. no. 44-1 at 3:45-4:15). The plaintiffs disagree with this assertion and contend that Lux was not pushing his friends and that his friends were not attempting to intervene. Id. (citing dkt. no. 44-1 at 3:45-4:15). Vander Steeg and Zens stepped in and told Lux to "knock it off" and Lux's friends attempted to calm him down. Dkt. No. 72 at ¶¶22-23. Lux said that he'd been "jumped" last week and the same people tried to jump him this week (apparently referring to the people across the street) and that he was going to get mad. Id. at ¶24. The officers did not talk to the individuals across the street. Dkt. No. 73 at ¶9.

---

[4] The defendants provided Martin's body cam footage; it does not show him separating Lux from anyone. Dkt. No. 42-1.

As Sergeant Martin returned Lux's identification, he told Lux that he would need to come with Martin if Lux's friends could not calm him down. Dkt. No. 72 at ¶25. Nettles told Sergeant Martin that Lux was "fine" and that Nettles would walk home with him. Id. at ¶26. Sergeant Martin asked Lux to promise that he would not find himself in another altercation before getting home and the two shook hands; Martin told Lux to call the police if someone tried to fight him. Id. at ¶¶27-28. Lux responded that he "would take care of it himself." Id. at ¶29. Sergeant Martin told Lux not to take care of it himself and repeated his instruction to Lux to go home. Id. at ¶30. Lux began walking home with Nettles. Dkt. No. 73 at ¶16.

C.  <u>Plaintiffs' Second Interaction with Police</u>

1.  *Beginning of Interaction (Vander Steeg's Body Camera)*

Approximately thirty minutes later, Officer Vander Steeg was parked in a Toppers Pizza parking lot about two hundred feet from the plaintiffs on their walk home when he began driving over to the plaintiffs and a third individual, Jack Piper. Dkt. No. 73 at ¶¶25-27; dkt. no. 72 at ¶31-32. The defendants say that Vander Steeg had seen and heard the plaintiffs yelling and pushing a male, later identified as Piper, across the street. Dkt. No. 72 at ¶31 (citing dkt. no. 46-1 at 6, 10, 12, 28). The plaintiffs contend that Piper was a teammate of Lux's and that Lux was having a conversation with Piper, that there was no yelling or pushing and that Vander Steeg could not have heard their conversation from his vantage point because it took him over a minute to drive to where the plaintiffs and Piper were. Id. (citing dkt. no. 62 at ¶¶11-17; dkt.

no. 63 at ¶¶13-7; dkt. no. 44-2 at 0:01-1:04); dkt. no. 73 at ¶¶28-29. According to the defendants, Piper later told several officers that he believed he would have been in danger but for the officers' arrival. Dkt. No. 72 at ¶34. The plaintiffs disagree, stating that Piper said he and Lux were teammates and friends and that Piper was not disturbed by the plaintiffs' actions. Id.

This portion of the events was captured by Vander Steeg's body camera for one minute and forty-eight seconds. Dkt. No. 44-2. The video begins with Vander Steeg pulling his car out of its parking spot; he states over the radio that he was "going to head over to behind the PD . . . there are three males pushing each other." Dkt. No. 72 at ¶31. Lux put his hands in the air immediately upon seeing Vander Steeg in his police vehicle. Dkt. No. 73 at ¶31. Vander Steeg then got out of his car and told the plaintiffs and Piper to "get over here." Id. at ¶32. The parties' accounts of the rest of Vander Steeg's interaction with the plaintiffs differ.

The plaintiffs insist that they did not understand why Vander Steeg was calling them over and assert that they only walked four to six steps away from Vander Steeg after he gave his order to come over. Id. at ¶¶33-34 (citing dkt. no. 62 at ¶¶23-24, 30, 33; dkt. no. 63 at ¶¶20-24). The plaintiffs also say that Vander Steeg ran past Piper to Lux. Id. at ¶35 (citing dkt. no. 62 at ¶22; dkt. no. 63 at ¶¶21; dkt. no. 61-1 at 1:15-1:22). They assert that Lux stopped walking and put his hands behind his head; they say that Nettles stopped walking and turned around in compliance with Vander Steeg's instructions. Id. at ¶¶36-37 (citing dkt. no. 62 a ¶¶22-23; dkt. no. 63 at ¶¶21-22; dkt. no. 61-1

6

at 1:22-1:27). The plaintiffs say Vander Steeg then grabbed Lux's arms from behind his head and attempted to put them behind Lux's back. <u>Id.</u> at ¶38. According to the plaintiffs, Nettles remained a few steps away at this time, asserting that they'd done nothing wrong. <u>Id.</u> at ¶¶40, 42 (citing dkt. no. 62 at ¶¶32-33; dkt. no. 63 at ¶¶22-28; dkt. no. 61-1 at 1:40-1:45). They also say that Vander Steeg threatened to taser Lux, that he called for backup even though Vander Steeg had control of Lux's arms and that Lux was not actively resisting or struggling. <u>Id.</u> at ¶¶41, 43-44 (citing dkt. no. 62 a ¶¶28, 30-34; dkt. no. 63 at ¶¶28-31; dkt. no. 61-1 at 1:30-1:48). The plaintiffs blame the rain for Vander Steeg's initial failure to grip Lux's arms, arguing that Lux's arms were wet. <u>Id.</u> at ¶45 (citing dkt. no. 62 a ¶35; dkt. no. 63 at ¶¶28-30). They maintain that Vander Steeg had full control over Lux and that Lux's arms were behind his back when the body camera turned off. <u>Id.</u> at ¶46 (citing dkt. no. 62 a ¶¶35-36; dkt. no. 63 at ¶¶28-30; dkt. no. 61-1 at 1:45-1:48).

The defendants assert that Piper immediately followed Vander Steeg's command to come to him. Dkt. No. 72 at ¶35 (citing dkt. no. 44-2 at 1:13-1:18). They contend that the plaintiffs did not comply, instead walking away from Vander Steeg. <u>Id.</u> at ¶37. They assert that the video shows the plaintiffs walking fifteen to twenty steps from Vander Steeg. Dkt. No. 73 at ¶34 (citing dkt. no. 44-2[5] at 1:07-1:22). They say that the plaintiffs failed to follow Vander Steeg's instructions even as he repeated them, that Vander Steeg had to make

---

[5] The defendants incorrectly cite to dkt. no. 44-1. The footage they are referring to is in dkt. no. 44-2.

his way to the plaintiffs and that Lux put his hands out in front of himself when he faced Vander Steeg. Id. at ¶¶36-37 (citing dkt. no. 61-1 at 1:20-1:23, 1:27); Dkt. No. 72 at ¶¶38-39 (citing dkt. no. 44-1 at 1:10-1:25). According to the defendants, Lux then said "no, no, no," as he turned to face Vander Steeg and Vander Steeg ordered him not to resist. Dkt. No. 72 at ¶¶41-42. The parties agree that Vander Steeg then attempted to put Lux's hands behind his back after Lux had moved them to the back of his head. Dkt. No. 73 at ¶38. They disagree that Nettles remained several steps away; the defendants assert that Nettles began to follow Vander Steeg as Vander Steeg attempted to walk Lux toward his squad car, yelling that Lux was not doing anything. Id. at ¶40 (citing dkt. no. 61-1 at 1:25-1:40); Dkt. No. 72 at ¶¶48-49 (citing dkt. no. 44-2 at 1:25-1:48). They also disagree that Vander Steeg had control over Lux's arms, dkt. no. 73 at ¶¶41, 43-45 (citing dkt. no. 61-1 at 1:00-1:48; dkt. no. 46-1 at 27), and the defendants state that Vander Steeg was outnumbered and had trouble keeping Nettles away, dkt. no. 72 at ¶46. The defendants argue that Vander Steeg attempted to put Lux in an "escort hold" but that Lux aggressively pulled away from him. Id. at ¶44. The defendants further argue that Lux moved his arm in an attempt to forcefully free himself from Vander Steeg's hands, jarring Vander Steeg's body and camera and disconnecting the wire from the camera's battery. Dkt. No. 73 at ¶46 (citing dkt. no. 46-1 at 29); dkt. no. 72 at ¶51 (citing dkt. no. 44-2 at 1:25-1:48; dkt. no. 46-1 at 26). The defendants state that Vander Steeg realized that Lux was much stronger than he and that Vander Steeg did not have the ability to grab Lux's arm and control

8

it. Dkt. No. 72 at ¶¶45 (citing dkt. no. 46-1 at 18-19, 27). They say that Vander Steeg had to tell his backup to "step it up" because he was outnumbered and struggling to control Lux. Id. at ¶50 (citing dkt. No. 44-2 at 1:25-1:48; dkt. no. 46-1 at 27).

Vander Steeg's body camera footage shows the plaintiffs walking several steps—more than five or six—away from Vander Steeg after Vander Steeg commanded them to come to him. Dkt. No. 44-2 at 1:07-1:22. It also shows Piper walking directly to Vander Steeg as Vander Steeg pulled up, before Vander Steeg moved around Piper to follow Lux and Nettles as they continued to walk away. Id. As Vander Steeg approaches the plaintiffs, they stop walking, turn around and Lux puts his hands out in front of himself. Id. Vander Steeg orders Lux to put his hands behind his back, after which Lux turns away again, then turns back, starts walking a few steps toward the police car, then returns his hands to the back of his head. Id. at 1:22-1:32. Vander Steeg repeats his command to Lux to put his hands behind his back as Vander Steeg puts his hands on Lux's shoulders and Lux steps off the sidewalk onto the road in the direction of the car. Id. at 1:32-1:35. Vander Steeg repeatedly and forcefully orders Lux to put his hands behind his back as Lux moves his hands back and forth from behind his head to his sides and back to his head. Id. at 1:35-1:43. The video flashes several shots of Nettles standing close to Lux and Vander Steeg as Nettles says something to Lux and repeats that they did not do anything. Id. at 1:27-1:31. During that time, Vander Steeg warns, "you're gonna get tasered," although it is not clear to whom he is speaking. Id. 1:28-

9

1:29. The last images of the video show Lux with his hands behind his back several feet behind Vander Steeg's squad car. Id. at 1:43-1:48. Vander Steeg's video cuts out at this point. There is no indication from the footage that Lux made any forceful movements immediately before the video cuts out. See id. at 1:48. There is no video evidence of what occurred between the time Vander Steeg's video stops and the time Johnson arrives on the scene several minutes later.

### 2.    *Portion of Interaction without Video Evidence*

The parties disagree about what happened after Vander Steeg's body camera video turned off.

The plaintiffs say that even though Vander Steeg had full control of Lux and Lux was not resisting, Vander Steeg tossed Lux over his hip, slamming Lux down onto the street face first. Dkt. No. 73 at ¶¶47, 50 (citing dkt. no. 62 at ¶¶24, 31, 35-36; dkt. no. 63 at ¶¶26-30). The parties agree that Lux landed on his face, chest and stomach, causing his arm to bleed. Id. at ¶¶48-49. The plaintiffs also say that Lux landed with his face in a puddle of water near the curb. Id. at ¶52 (citing dkt. no. 62 at ¶¶38-41; dkt. no. 63 at ¶¶32-37). Vander Steeg then placed his knee on Lux's back to handcuff him. Id. at ¶53. The plaintiffs maintain that Lux was not resisting and that he was struggling to breathe as his face was left in the puddle for approximately ten minutes. Id. at ¶¶53-55 (citing dkt. no. 62 at ¶¶38-41, 49; dkt. no. 63 at ¶¶32-37, 56-57). They say that Lux stated multiple times that he could not breathe while in the puddle. Id. at ¶56 (citing dkt. no. 62 at ¶¶38-40, 45, 47-48; dkt. no. 63 at

10

¶¶32-37, 53-55). According to the plaintiffs, this happened before other officers arrived. Id. at ¶57 (citing dkt. no. 62 at ¶44; dkt. no. 63 at ¶38).

The defendants say that Vander Steeg was unable to control Lux and was concerned about his own safety with Nettles behind him. Dkt. No. 72 at ¶55. They say Lux made a quick movement forward, separated himself from Vander Steeg and that Vander Steeg performed the "hug-yourself decentralization technique." Dkt. No. 73 at ¶47 (citing dkt. no. 44-2 at 1:45-1:48; dkt. no. 46-1 at 26-27). This is a technique in which the officer twists the suspect to take him or her off-balance and lowers him or her to the ground on their stomach. Dkt. No. 72 at ¶¶53-54. The defendants state that Lux was resisting even after he was moved to the ground and Vander Steeg was still having trouble getting Lux's hands behind his back. Id. at ¶¶58-59. They also say that Lux's face was not directly in the puddle and that he had free movement over his neck and face and that he was resisting while on the ground. Dkt. No. 73 at ¶52, 54-56 (citing dkt. no. 46-1 at 22-23; dkt. no. 46-2 at 7). The defendants contend that Zens arrived while Lux was still on his feet, id. at ¶57 (citing dkt.no. 46-2 at 6), but in response to the plaintiffs' proposed findings of fact indicate that he arrived after Lux was already on the ground, see dkt. no. 72 at ¶60. They say that Zens pulled out his taser when he arrived and ordered Lux to put his hands behind his back or get tased. Dkt. No. 72 at ¶60. They insist that Lux still did not comply and that after another thirty to fifty seconds, Zens and Vander Steeg worked together to finally get Lux in handcuffs. Id. at ¶61.

11

Officer Zens' body camera was not turned on when he arrived. Dkt. No. 73 at ¶60. The plaintiffs argue that Zens briefly assisted Vander Steeg with holding Lux on the ground while Lux's face remained in the puddle. Id. at ¶59 (citing dkt. no. 63 at ¶¶38-40). They continue to maintain that Lux was not resisting at this time. Id. They say that Nettles tried to record Vander Steeg and Lux on his phone until one of the officers yelled "phone, phone" and Zens ran from Lux toward Nettles. Id. at ¶¶61-64 (citing dkt. no. 62 at ¶44; dkt. no. 63 at ¶¶38-44). Zens told Nettles to put his hands behind his back. Id. at ¶63. The plaintiffs say that Zens had and maintained control over Nettles' arms as he moved him over to the squad car and that Nettles was not resisting. Id. at ¶¶ 65-67 (citing dkt. no. 63 at ¶¶42-46).

The defendants say that Lux had free range of motion over his head and neck while on the ground. Id. at ¶59 (citing dkt. no. 46-1 at 22-23; 46-2 at 7). They also argue that the plaintiffs' assertions about Nettles' phone and the officers' statements are inadmissible or not supported by admissible evidence. Id. at ¶¶61-62, 64 (citing Fed. R. Civ. P. 56(c); Civil L.R. 56(b)(2) (E.D. Wis.)). They say that throughout the interaction, Nettles "would kick at the officers, backup and then do it again," and that Nettles abruptly pulled his arm away from Zens and attempted to run away. Id. at ¶¶64-67 (citing dkt. no. 46-2 at 8, 10; dkt. no. 61-3 at 0:55-1:08). The defendants assert that Zens told Nettles to put his hands behind his back and that Nettles did not comply. Dkt. No. 72 at ¶¶66-67 (citing dkt. no. 46-2 at 10; dkt. no. 61-3 at 0:55-1:08). They say Zens

12

then tried to grab Nettles' arms but that Nettles pulled his left arm away. Dkt. No. 73 at ¶65 (citing dkt. no. 46-2 at 10).

### 3. *Johnson Arrives (Johnson and Zens' Body Cameras)*

Deputy Johnson arrived at the scene after Lux was already on the ground. His body camera was on for the entire time he was at the scene, although it is muted for a period after the plaintiffs had been placed in police cars. See Dkt. No. 61-3. When Johnson arrived, Zens was standing by Nettles near the squad car. Id.

The plaintiffs insist that although Nettles was not resisting, Zens slammed Nettles' face into the car in the presence of Vander Steeg. Dkt. No. 73 at ¶¶68, 70 (citing dkt. no. 63 at ¶¶47-50; dkt. no. 61-3 at 1:04-1:12). According to the plaintiffs, the force of Nettles' collision with the car chipped his tooth in half and caused Nettles's glasses to fall off his face. Id. at ¶69. Nettles was then handcuffed. Id. at ¶71. The plaintiffs say that after Nettles was handcuffed, Zens "finally" turned on his body camera. Id. at ¶72. The plaintiffs say that Nettles could see that Lux's face was still in the puddle and that he pleaded with the officers to get Lux out of the puddle. Id. at ¶73 (citing dkt. no. 63 at ¶¶43-45; dkt. no. 61-2 at 0:30-0:43). Lux did not move from that position, and the plaintiffs attribute this to his fear that Vander Steeg would further injure him if he attempted to move. Id. at ¶74 (citing dkt. no. 62 at ¶46). The plaintiffs assert that Vander Steeg then rolled Lux further into the puddle before lifting him up and placing him into Vander Steeg's squad car. Id. at ¶¶75-76 (citing dkt. no. 62 at ¶¶45, 48-49; dkt. no. 63 at ¶¶36, 53-57, 60;

13

dkt. no. 61-2 at 0:36-0:44). According to the plaintiffs, Vander Steeg and Zens failed to help Lux out of the puddle "[d]uring the approximately ten minutes Lux struggled to breathe and was forced to remain face down in a puddle of water," and Vander Steeg failed to stop Zens from slamming Nettles' head into the squad car. Id. at ¶¶77, 79 (citing dkt. no. 62 at ¶49; dkt. no. 63 at ¶¶57-59; dkt. no. 61-3 at 1:02-3:17).

Regarding the alleged "slam" into the police vehicle, the defendants say that Zens was performing a "wall stabilization technique." Id. at ¶¶68, 72 (citing dkt. no. 63 at ¶¶47-50; dkt. no. 61-3 at 1:04-1:12; dkt. no. 61-2 at 0:01-2:51). They admit that Nettles' face and body contacted the squad car. Dkt. No. 72 at ¶77. The defendants say that Zens told Nettles to stop resisting but Nettles refused to allow Zens to place his hands behind his back and attempted to break free and escape. Id. at ¶69-70 (citing dkt. no. 46-2 at 5-6; dkt. no. 61-3 at 0:55-1:08). They argue that Zens used the wall-stabilization technique to gain control. Dkt. No. 73 at ¶70 (citing dkt. no. 61-3 at 1:04-1:12). The defendants contend that Nettles was handcuffed only after Vander Steeg and Johnson came over to assist Zens. Id. at ¶71 (citing dkt. no. 61-3 at 1:00-1:30). They say Vander Steeg left Lux alone for roughly thirty seconds to help Zens place handcuffs on Nettles. Dkt. No. 72 at ¶71 (citing dkt. no. 46-1 at 23). The defendants contend that Nettles never asked the officers to move Lux and that Lux was briefly rolled onto his side and frisked. Dkt. No. 73 at ¶¶73, 75 (citing dkt. no. 46-1 at 22; dkt. no. 61-3 at 0:56-3:42). They insist that no officer ever forced Lux's face into the ground or into a puddle. Dkt. No. 72 at ¶73. The

defendants also say that Vander Steeg's and Zens' compliance techniques were used solely due to the plaintiffs' continued and active resistance. Id. at ¶80.

Officer Stuppy arrived after Lux and Nettles had been arrested. Id. at ¶¶83-84. The defendants say—and the plaintiffs do not dispute—that Stuppy "did not help Officers Vander Steeg or Zens arrest Lux and Nettles." Id. at ¶84. They say that Stuppy interviewed Piper and Piper told him that the plaintiffs had "tried to jump [him]" on his way home. Id. at ¶85 (citing dkt. no. 43-1 at 5:00-5:07). The plaintiffs respond that they did not try to "jump" Piper, emphasizing that he was a teammate of Lux's. Id. (citing dkt. no. 62 at ¶¶11-19). Piper was cited for underage drinking and the plaintiffs were arrested for disorderly and objectionable conduct, resisting/obstructing an officer and failure to obey a police order. Id. at ¶¶86-87. The plaintiffs were found guilty of disorderly and objectional conduct and did not appeal their convictions. Id. at ¶88.

The defendants have provided body cam footage from Johnson and Zens showing portions of what occurred during this part of the interaction. They also have provided footage from Stuppy's body cam, which shows his interview with Piper.

Zens' footage begins after Nettles is already in handcuffs. Dkt. No. 61-2. The video is muted for the first thirty seconds as Nettles is saying something to the officers and Zens is checking Nettles' identification. Id. at 0:00-0:30. The video captures Lux on the ground with his face in the puddle until Vander

Steeg rolls him onto his side. Id. at 0:30-0:45. Vander Steeg and Johnson then both grab Lux, one at each arm, and lift him up. Id. at 0:52-0:58.

Johnson's footage begins just before Johnson arrives on the scene. Johnson is parked in a position where the camera almost immediately shows both plaintiffs, Zens and Vander Steeg as Johnson walks toward the scene. Dkt. No. 61-3 at 1:03. The recording shows Lux laying face down on the street with Vander Steeg standing over him. Id. It is unclear whether Lux's face is in the puddle at that time. Nettles is on his feet facing the police car while Zens has Nettles's hands behind Nettles's back. Id. Nettles turns around and puts a foot up on the sidewalk immediately next to where he is standing. Id. at 1:05-1:06. Zens grabs Nettles and spins him around to face the vehicle as he pushes him up against the vehicle. Id. at 1:06-1:08. At that point, Johnson rushes toward Nettles and Zens and instructs bystanders to move away from the officers before helping to hold Nettles in place as Zens places Nettles in handcuffs. Id. at 1:07-1:37. Johnson bends down to pick up Nettles's glasses at Nettles's request and Nettles shows Johnson his cracked tooth. Id. at 1:35-2:03.

Johnson next walks over to where Vander Steeg is searching Lux while Lux is laying on the ground on his right side. Id. at 2:23-2:34. Someone can be heard saying "get him off the ground." Id. at 2:34-2:40. After searching Lux's left side, Vander Steeg tells Lux several times to "roll the other way," which Lux does not do immediately; at one point, Lux says, "No." Id. at 2:34-2:42. Vander Steeg tells Lux that he is resisting, and Lux responds, "I'm not resisting, I'm

16

just [inaudible]." Id. at 2:40-2:45. Lux then complies and rolls onto his stomach where his face is in a puddle, and he is seen blowing out water as he breathes. Id. at 2:44-2:51. Johnson is seen moving his own foot up onto the sidewalk after it had been immediately next to Lux's face in the puddle. Id. Lux is left in this position for six or seven seconds before Johnson and Vander Steeg roll Lux onto his right side to search his left. Id. at 2:51-3:04. As he is being rolled onto his right side, Lux spits water out of his mouth onto the ground. Id. Vander Steeg then rolls Lux back onto his stomach for four to five seconds before rolling him onto his back and, with the help of Johnson, lifting Lux off the ground. Id. at 3:04-3:26. Vander Steeg then places Lux into his squad car and views his identification while Johnson recovers Lux's hat from the sidewalk and places it into the car next to Lux. Id. at 3:26-4:34.

Stuppy's body camera recorded his and Vander Steeg's interview with Piper. During the interview, Piper stated that he was walking home when the plaintiffs tried to "jump [him]." Dkt. No. 43-1 at 5:00-5:05. He initially denied that they were in a physical fight. Id. at 5:13-5:16. He then indicated that Lux had said he would get "beat up," but denied that anyone tried to hit him. Id. at 6:52-7:10. Piper's story changes when Vander Steeg said he saw the plaintiffs pushing Piper; Piper seems to nod in agreement. Id. at 8:08-8:25. Several seconds later, Piper tells the officers, "within five minutes, if you hadn't come here within five minutes, my ass would have been on the ground. I mean, maybe not. But like, they would have punched me." Id. at 9:14-9:24. Piper also

says several times that he does not want to get the other guys in trouble and that they are good guys.

D.   Officer Training

The City of Whitewater Police Department requires all new prospects to complete the police academy before beginning their employment with the municipality. Dkt. No. 72 at ¶90. This program provides the officers with training on "DAAT, investigations, discriminatory enforcement, making arrests, officer/subject factors, and use of force, among other things." Id. Training records for each officer include the "course, year, location and number of hours." Id. at ¶99.

The officers also are given a copy of all City of Whitewater Police Department policies and procedures and are required to know them and sign that they read them. Id. at ¶¶91, 93. This includes, but is not limited to, written policies on "Body Worn Cameras, Use of Force, Use of Force Investigations, Arrests, Criminal Investigations, Discrimination, and Patrol." Id. at ¶92. The policies are reviewed and updated every two to three years and Vander Steeg, Raap and Deputy Chief Daniel Meyer conduct evaluations of the policies at the same frequency. Id. at ¶¶94-96. Officers then are provided with the updated policies and procedures and again are required to review and acknowledge the changes. Id. at ¶97. Unified task instructors train City of Whitewater police officers every year and there are set minimum-hour requirements for officer training. Id. at ¶¶100-01.

18

## II. Motion for Summary Judgment (Dkt. No. 40)

### A. Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Federal Rule of Civil Procedure 56(a). "Material facts" are those that, under the applicable substantive law, "might affect the outcome of the suit." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute over a material fact is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

A moving party "is 'entitled to a judgment as a matter of law'" when "the nonmoving party has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Still,

> a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.

Id. (internal quotation marks omitted).

To determine whether a genuine issue of material fact exists, the court must review the record, construing all facts in the light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor. See Heft v. Moore, 351 F.3d 278, 282 (7th Cir. 2003) (citing Liberty Lobby, 477 U.S. at 255). "However, [the court's] favor toward the nonmoving party does not extend to drawing inferences that are supported by only speculation or

19

conjecture." <u>Fitzgerald v. Santoro</u>, 707 F.3d 725, 730 (7th Cir. 2013) (quoting <u>Harper v. C.R. Eng., Inc.</u>, 687 F.3d 297, 306 (7th Cir. 2012)). That is, "to survive summary judgment, the non-moving party must establish some genuine issue for trial 'such that a reasonable jury could return a verdict' in her favor." <u>Fitzgerald</u>, 707 F.3d at 730 (quoting <u>Makowski v. SmithAmundsen LLC</u>, 662 F.3d 818, 822 (7th Cir. 2011)).

Section 1983 of Title 42 allows a person to sue anyone who, "under color of" state law, deprives that person of his constitutional rights. "To prevail on a § 1983 claim, the plaintiff must prove 'that: (1) he was deprived of a right secured by the Constitution or laws of the United States; and (2) the deprivation was visited upon him by a person or persons acting under color of state law.'" <u>Bohanon v. City of Indianapolis</u>, 46 F.4th 669, 675 (7th Cir. 2022) (quoting <u>Buchanan-Moore v. Cty. of Milwaukee</u>, 570 F.3d 824, 827 (7th Cir. 2009)).

B.    <u>Parties' Arguments</u>

The defendants first argue that the claims against Stuppy must be dismissed because he did not participate in the alleged constitutional violations. Dkt. No. 57 at 4-5 (citing <u>Hildebrandt v. Ill. Dep't Nat. Resources</u>, 347 F.3d 1014, 1039 (7th Cir. 2003)). They assert that Stuppy arrived at the scene after the plaintiffs had been arrested and he had no contact with the plaintiffs. <u>Id.</u> at 5.

The defendants next argue that the plaintiffs' false arrest claim fails for two reasons: (1) it is barred by <u>Heck v. Humphrey</u>, 512 U.S. 477, 486-87 (1994)

and (2) the officers had probable cause for the arrests. Id. at 5-6. The defendants assert that Heck bars the plaintiffs' false arrest claim because the plaintiffs were convicted of disorderly and objectionable conduct and did not appeal their convictions. Id. at 6. As to the second reason, the defendants argue that the officers had probable cause to arrest the plaintiffs under Whitewater Ordinances 7.02.010, 7.03.010 and 7.36.020.4. Id. at 7. They insist that "probable cause precludes a Section 1983 claim for false arrest." Id. at 6-7 (citing Sheik-Abdi v. McClellan, 37 F.3d 1240, 1247 (7th Cir. 1994)). They argue that probable cause was established by Vander Steeg's observation of the plaintiffs shouting obscenities at Piper and pushing Piper several times. Id. at 8-9. The defendants point to evidence showing that Vander Steeg ordered the plaintiffs to come over to him as the plaintiffs continued to walk in the opposite direction. Id. at 9.

The defendants also challenge the plaintiffs' equal protection claims, arguing that the plaintiffs have not provided any evidence that the officers were motivated by a discriminatory purpose. Id. (citing Sow v. Fortville Police Dep't, 636 F.3d 293, 303 (7th Cir. 2011)).

Next, the defendants argue that the plaintiffs' claim of excessive force must be dismissed because the amount of force exerted by the officers was reasonable under the circumstances. Id. at 10. They argue that the court must consider the fact that the plaintiffs were "intoxicated and aggressive." Id. at 11. They say that "it is undisputed that none of the Officers knelt on the Plaintiffs, pushed their faces into water puddles, stomped on them, stood on their legs, or

shoved them into the squad cars as alleged in the Plaintiffs' Amended Complaint." Id. Rather, the defendants argue that the officers used specialized techniques to control the two as they were actively resisting. Id. The defendants cite and discuss numerous cases supporting that control techniques are reasonable when a person is actively resisting an arrest. Id. at 11-12 (listing cases). They say that Lux's significant size advantage over Vander Steeg and the fact that Vander Steeg was outnumbered by Lux and Nettles created a difficult environment for controlling Lux while Vander Steeg attempted to place him in custody before backup arrived. Id. at 12-13. They argue that Vander Steeg may have been in danger if he had not employed such techniques and that Nettles required Zen to use control techniques because Nettles had resisted by pulling his arm away. Id. at 13.

The defendants argue that it follows that the plaintiffs' claim for failure to intervene must fail because the officers had no duty to intervene where no constitutional violation was being committed. Id. They argue that even if a constitutional violation had occurred, the law requires a plaintiff alleging a failure-to-intervene claim to prove that the officer had reason to know that the constitutional violation was occurring. Id. at 14.

The defendants further argue that the officers are entitled to qualified immunity. Id. at 14-15. They assert that the plaintiffs cannot show any violation of a clearly established right. Id. at 15. Beginning with Stuppy, the defendants argue "there is no clearly established law holding a police officer constitutionally liable when he was not personally involved in the alleged

22

constitutional violation." Id. They argue that the other officers are entitled to qualified immunity for takedowns used to gain control of a suspect during an arrest and that "'only when precedent places the invalidity of particular action beyond debate may damages be awarded.'" Id. at 16 (quoting Johnson v. Rogers, 944 F.3d 966, 969 (7th Cir. 2019)). The defendants then reiterate that Vander Steeg's and Zens' control techniques were necessary because of the plaintiffs' resistance. Id.

As to the Monell claim, the defendants argue that the plaintiffs cannot establish a constitutional violation caused by an official municipal policy or custom or inadequate training. Id. at 17-19. They argue that no constitutional violation occurred, meaning the plaintiffs cannot bring a claim against the City of Whitewater. Id. at 17. They further argue that the plaintiffs have not shown any supporting history for a harmful "*de facto*" policy. Id. at 18. The plaintiffs say that the "City of Whitewater actually has express written policies that every officer must follow which prohibit police officers from making false arrests, discriminating, and using excessive force." Id.

The defendants assert that there is no evidence of any "'custom or usage' of condoning the alleged constitutional violations." Id. at 19. They argue that the plaintiffs have provided no evidence of any "known and permanent custom of discriminating based on race, arresting individuals without probable cause, or using excessive force." Id. at 20. The defendants similarly state that the plaintiffs have presented no evidence that the officers were inadequately trained, supervised or disciplined by Whitewater. Id. They point to the police

23

academy training program required before officers begin their employment as well as the requirement that each officer understand and sign Whitewater's written policies and procedures. Id. They also discuss a "twelve-week field training program where they received more training from experienced police officers on several police practices, . . ." and annual training with unified task instructors Id. at 21-22. The defendants argue that even if all of this is insufficient, there is no evidence that the City of Whitewater or Rapp had reason to know about the deficiencies. Id. at 22 (citing Connick v. Thompson, 563 U.S. 51, 61 (2011)).

Finally, the defendants argue that the court must dismiss the plaintiffs' request for punitive damages because there is no evidence of evil motive or intent on the part of any of the officers. Id. at 23 (citing Soderbeck v. Burnett Cty., 752 F.2d 285, 290 (7th Cir. 1985)). They say that they gave the plaintiffs an opportunity to avoid legal action earlier in the evening before the encounter occurred and that all they force they used reflected the plaintiffs' increasing levels of resistance. Id. at 23. The defendants say that even after Vander Steeg saw the plaintiffs pushing Piper, he did not initiate an arrest first—he first asked them to come over to him and initiated arrest only when they refused to listen to his commands and resisted. Id.

The plaintiffs do not respond to the defendants' arguments on Stuppy, the false arrest claim, the equal protection claim or the Monell claim; their brief focuses entirely on Vander Steeg and Zens. The plaintiffs first argue that Vander Steeg used excessive force in violation of their Fourth Amendment

24

rights. Dkt. No. 68 at 5. They say that the evidence shows a dispute over whether Lux and Nettles were pushing Piper prior to Vander Steeg's arrival. Id. at 6. The plaintiffs point to evidence disputing the defendants' interpretation of events. They argue that the plaintiffs did not resist or attempt to flee at any point and that Lux was nonetheless taken down with force. Id. at 6-7. They argue that it is "convenient" that Vander Steeg's body camera was shut off "right before he slammed Lux into the street and forced Lux's face into a puddle next to the curb." Id. at 6. The plaintiffs say that the "body slam" caused Lux's face, stomach and chest to make direct contact with the street. Id. at 7. They add that the takedown and subsequent conduct by Vander Steeg caused Lux's face to go into and stay in a puddle of water for approximately ten minutes. Id. at 7-10. The plaintiffs argue that their own accounts conflict with those of the officers and create a dispute for a jury depending on each individual's credibility. Id. at 8 (citing Deets v. Massman Const. Co., 811 F.3d 978, 982 (7th Cir. 2016)). They make a similar argument about the factual determinations that can be derived from the officers' body camera footage. Id. at 8-9. As to Nettles, the plaintiffs argue that Zens slammed him into the squad car. They say that there is a dispute as to whether Nettles was resisting, fleeing or kicking the officers and that the body camera footage shows that Nettles was not making any sudden movements while Zens had his hands on him. Id. at 10-11.

The plaintiffs argue that both Vander Steeg and Zens had opportunities to intervene to prevent the other's behavior. They say that Vander Steeg failed

25

to intervene when Zens "began slamming" Nettles into the squad car even though he was only a few feet away. Id. at 12. They say that Zens could have helped move Lux out of the puddle to a safer location and stopped Vander Steeg's "abuse." Id. at 12-13. They argue that both officers were in close proximity to each other as well as the plaintiffs and witnessed what the other was doing to "non-resisting suspects." Id. at 13.

The plaintiffs dispute that Vander Steeg and Zens are entitled to qualified immunity. They argue that

> the facts asserted to be viewed in the light most favorable to the plaintiffs require a view that: 1) After Lux initially walked away from Vander Steeg he was not actively resisting (PPFOF, ¶50); 2) Vander Steeg then thew the non-resisting Lux to the ground (PPFOF, ¶50); 3) while on the ground, Lux was not resisting and was struggling to breathe (PPFOF, ¶52-54); 4) Vander Steeg required Lux to stay in that position for approximately 10 minutes (PPFOF, ¶55-56); 5) Nettles was not resisting when approached by Zens (PPFOF, ¶70); and 6) Zens slammed the non-resisting Nettles face into the cop car. (PPFOF, ¶68-70).

Id. at 14 (citing to Dkt. No. 64). They assert that the officers were not permitted to use force after an individual is subdued. Id. The plaintiffs argue that neither plaintiff was resisting when the officers applied the respective force. Id. They argue that the plaintiffs were, at most, passively resisting, differentiating such resistance from active resistance. Id. at 15-16. The plaintiffs insist that "[t]he law proscribing escalation of force on non-resisting or even 'passively' resisting individuals was well established at the time these events occurred, thus, Vander Steeg and Zens are not entitled to qualified immunity." Id. at 16 (citing Todero v. Blackwell, 383 F. Supp. 3d 826, 833-36 (S.D. Ind. 2019)).

Finally, the plaintiffs argue that punitive damages can be awarded based on the circumstances. Id. at 17. They say that the evidence shows that the officers used excessive force and that a jury could conclude that the conduct "amounted to callous disregard" of their protected rights. Id.

The defendants argue in their reply that the plaintiffs' failure to respond to their equal protection, false arrest and Monell claims and all claims against Stuppy constitutes waiver of those claims. Dkt. No. 71 at 3 (citing Citizens for Appropriate Rural Roads v. Foxx, 815 F.3d 1068, 1075 (7th Cir. 2016)). They then argue that the court should not accept the plaintiffs' facts, specifically the declarations by Lux and Nettles. Id. at 4. They assert that the plaintiffs' description of the events "blatantly contradicts objective evidence in the record, i.e., the Defendants Body Camera footage, Police reports, deposition testimony, and even Plaintiffs' guilty plea" and "cannot create a dispute of fact that is actually supported by the record." Id. (citing Scott v. Harris, 550 U.S. 372, 380 (2007)). The defendants also dispute the plaintiffs' assertions that they did not do anything wrong that night, pointing to their plea agreements and the video evidence the defendants believe shows both plaintiffs resisting officers. Id. at 5.

As to the excessive force claims, the defendants argue that the plaintiffs' subjective beliefs about whether they were resisting are irrelevant and that "objective actions, such as: walking away, disobeying an officer's orders, and refusing to put their hands up, would demonstrate to a reasonable officer that they did intend to resist." Id. at 7. They contend that the evidence shows that the officers were in a dangerous situation. Id. The defendants point to the

27

conduct underlying the plaintiffs' guilty pleas, the statements by Piper to the officers and the fact that Vander Steeg was outnumbered and outsized when he arrived on the scene. Id. at 7-8.

The defendants arguments regarding failure to intervene essentially mirror the arguments in their original brief, as do their responses to the plaintiffs' arguments about qualified immunity. Id. at 10-12. The defendants dispute the plaintiffs' descriptions of the relevant case law on punitive damages, specifically Soderbeck and Smith. Id. at 12-13.

C.     Analysis

The plaintiffs have not responded to the defendants' arguments that (a) Stuppy was not involved in the alleged constitutional violations, (b) Heck v. Humphrey bars the false arrest claim, (c) the plaintiffs have presented no evidence supporting their allegations of Equal Protection violations and (d) the plaintiffs have presented no evidence in support of a Monell claim. The defendants cite several cases in support of the proposition that "[i]n this Circuit, a failure to respond is considered a waiver of those claims." Dkt. No. 71 at 3 (citing Betco Corp., Ltd. v. Peacock, 876 F.3d 306, 309 (7th Cir. 2017); Citizens for Appropriate Rural Roads v. Foxx, 815 F.3d 1068, 1075 (7th Cir. 2016); Walton v. U.S. Steel Corp., 497 F. App'x 651, 655 (7th Cir. 2012); Laborers' Int'l Union of N. Am. v. Caruso, 197 F.3d 1195, 1197 (7th Cir. 1999); U.S. Bank. Nat. Ass'n v. Long, No. 13-C-0257, 2014 WL 2050662, at *5 (E.D. Wis. May 19, 2014)).

28

The defendants misstate the holdings of several of the cases they cite. In Beto Corp., the Seventh Circuit held that *it*—the appellate court—would not consider arguments that were not presented to the district court, stating that "[w]hen a party presents an underdeveloped or conclusory argument below, the party does not preserve its claim for appeal." Beto Corp., 876 F.3d at 309 (citations omitted). It held the same in Walton and Caruso. Finding that failure to present an argument to the lower court constitutes failure to preserve the argument on appeal does not equate to a finding that a non-movant's failure to respond to a summary judgment argument entitles the movant to prevail on that argument. In Foxx, it was the *district* court—not the Seventh Circuit—that concluded that the non-moving party had waived several counts of the complaint because they had not responded to the defendant's summary judgment argument that the claims were not ripe. Foxx, 815 F.3d at 1075. But the district court addressed the substantive argument that the claims were not ripe, as did the Seventh Circuit.

The defendants did not cite relevant Seventh Circuit case law holding that a non-movant's failure to respond to a summary judgment argument does not entitle the movant to prevail on that argument. In Raymond v. Ameritech Corp., 442 F.3d 600, 608 (7th Cir. 2006), the Seventh Circuit explained that

> a non-movant's failure to respond to a summary judgment motion, or failure to comply with [a local rule regarding summary judgment], does not, of course, automatically result in judgment for the movant. The ultimate burden of persuasion remains with [the moving party] to show that it is entitled to judgment as a matter of law.

(Citations omitted.)

29

Just last year, the court reiterated this principle in <u>Marcure v. Lynn</u>, 992 F.3d 625, 631 (7th Cir. 2021), stating, "Rule 56 imposes an affirmative obligation on a movant that we cannot ignore merely because a nonmovant provides no responsive arguments." And in <u>Robinson v. Waterman</u>, 1 F.4th 480, 483 (7th Cir. 2021), the court emphasized that

> [r]egardless of the local rules, a failure to file a timely response to [a summary judgment] motion is not a basis for automatically granting summary judgment as some kind of sanction. *See Raymond v. Ameritech Corp.*, 442 F.3d 600, 608 (7th Cir. 2006) (citing cases); see also *Marcure v. Lynn*, 992 F.3d 625, 631 (7th Cir. 2021) (extending rule to analogous context of Rule 12(b)(6)). Even where a nonmovant fails to respond to a motion for summary judgment, the movant "still had to show that summary judgment was proper given the undisputed facts," *Yancick v. Hanna Steel Corp.*, 653 F.3d 532, 543 (7th Cir. 2011), with those facts taken as usual in the light most favorable to the nonmovant.

The court will not deem the plaintiffs to have conceded the defendants' arguments on these issues.

1. *Stuppy*

The amended complaint alleges that defendant Stuppy violated the Equal Protection Clause when he, Vander Steeg and Zens "stopped and questioned [the plaintiffs] without reason and then utilized unlawful and excessive force against [the plaintiffs] as they arrested [the plaintiffs] and further unlawfully detained them." Dkt. No. 29 at ¶48. It alleges that that Stuppy, Vander Steeg and Zens used excessive force against the plaintiffs by "grabbing, tackling, injuring Plaintiffs' necks and faces, kneeling on Plaintiffs in the back, pushing their faces into water puddles, where both Plaintiffs had difficulties breathing, standing on their legs and shoving Nettles' face into the squad car." <u>Id.</u> at 58. It

alleges that Stuppy, Vander Steeg and Zens arrested the plaintiffs without probable cause. Id. at ¶¶66-67. And it alleges that Stuppy witnessed Vander Steeg and Zens using excessive force on the plaintiffs and failed to intervene. Id. at ¶¶73-78.

But the defendants say—and the plaintiffs do not dispute—that Stuppy "did not help Officers Vander Steeg or Zens arrest Lux and Nettles." Dkt. No. 72 at ¶84. Stuppy's body cam footage shows that by the time he pulled his squad car up to the scene, Lux was lying on his side and Nettles was against another squad car. Dkt. No. 43-1 at 02:14. The video shows Stuppy walking past Lux, Nettles and the other officers and going straight to an individual standing in the parking lot, then turning his attention to Piper. Id. at 02:14-02:20. Stuppy spends the remainder of his time at the scene—a total of about thirteen minutes—talking with, and eventually detaining, Piper.

"[I]ndividual liability under § 1983 requires 'personal involvement in the alleged constitutional deprivation.'" Minix v. Canarecci, 597 F.3d 824, 833 (7th Cir. 2010) (quoting Palmer v. Marion C'nty, 327 F.3d 588, 594 (7th Cir. 2003)). "In a civil-rights action under 42 U.S.C. § 1983, plaintiffs must sue the people personally responsible for the violation." Henderson v. Jess, No. 21-1585, 2022 WL 1831133, at *4 (7th Cir. June 3, 2022) (citing Mitchell v. Kallas, 895 F.3d 492, 498 (7th Cir. 2018)). "Without evidence of personal involvement, [defendants] cannot be liable under § 1983." Martin v. Noble Cty. Sheriff's Dept., No. 21-1214, 2021 WL 5505407, at *1 (7th Cir. Nov. 24, 2021) (citing Colbert v. City of Chi., 851 F.3d 649, 657 (7th Cir. 2017)).

31

The plaintiffs have presented no evidence that Stuppy was personally involved the alleged violations of their rights. He was not present when other defendants allegedly used excessive force against the plaintiffs. He was not involved in the arrest. His only involvement in the incident was in talking with a fourth individual at the scene and interviewing and detaining Piper.

The court will grant summary judgment in favor of Stuppy due to his lack of personal involvement.

2. *Count I – Fourteenth Amendment Equal Protection Clause*

In their first claim, the plaintiffs assert that Vander Steeg and Zens discriminated against them on the basis of race when they stopped and questioned the plaintiffs for no reason, used excessive force against them and arrested them. Dkt. No. 29 at ¶¶48-50.

"To show a violation of the Equal Protection Clause, plaintiffs must prove that the defendants' actions had a discriminatory effect and were motivated by a discriminatory purpose." Chavez v. Ill. State Police, 251 F.3d 612, 635-36 (7th Cir. 2001) (citing Pers. Adm'r of Mass. v. Feeney, 442 U.S. 256, 272-74 (1979); Arlington Heights v. Metro. Housing Dev. Corp., 429 U.S. 252, 264-66 (1977); Washington v. Davis, 426 U.S. 229, 239-42 (1976)). "To prove discriminatory effect, the plaintiffs are required to show that they are members of a protected class, that they are otherwise similarly situated to members of the unprotected class, and that plaintiffs were treated differently from members of the unprotected class." Id. at 636. To show that the defendants were motivated by a discriminatory purpose, plaintiffs must "show that the

32

decisionmaker . . . selected or reaffirmed a particular course of action at least in part 'because of' . . . its adverse effects upon an identifiable group." Id. at 645 (quoting McCleskey v. Kemp, 481 U.S. 279, 298 (1987)).

The plaintiffs have presented no evidence of discriminatory effect or that the defendants were motivated by a discriminatory purpose. The plaintiffs are Black and thus are members of a protected class. See McDuffy v. Federal Exp. Corp., 130 F. App'x 49, 50 (7th Cir. 2005) (African-American person member of protected class). But the plaintiffs have presented no evidence that they are otherwise similarly situated to members of the unprotected class or that they were treated differently than members of the unprotected class. Nor have they presented any evidence that the defendants violated their rights because they were Black. The evidence viewed in the light most favorable to the plaintiffs shows that some of the defendants had an encounter with the plaintiffs earlier in the evening—an encounter during which Lux was agitated, yelling at people across the street and saying he was going to "take care of" the situation. After Nettles agreed to walk Lux home, Vander Steeg encountered the defendants— and Piper and a fourth individual—and indicated that he was stopping because he saw the men "pushing each other." When Vander Steeg demanded that the plaintiffs come over to where he was standing, they did not do so (Piper did). Although the plaintiffs are Black and Piper and the fourth individual appear to be white, the plaintiffs have presented no evidence that the officers took the actions they did because they were Black. The evidence indicates that the

33

officers took the actions they did because they perceived the plaintiffs to be disobedient and resistant.

The court will grant the defendants' motion for summary judgment as to Count One and will dismiss the Equal Protection claim.

### 3. *Count II – Excessive Force*

In the second claim, the plaintiffs allege that Vander Steeg and Zens used unnecessary and excessive force against them without cause or justification. Dkt. No. 29 at ¶¶58-60.

The Fourth Amendment prohibits "unreasonable" seizures, so "[r]easonableness is always the touchstone of Fourth Amendment analysis." Cty. of Los Angeles, Calif. v. Mendez, ___ U.S. ___, 137 S. Ct. 1539, 1546 (2017) (quoting Burchfield v. North Dakota, 579 U.S. 438, 477 (2016)). In determining whether an officer's force in seizing someone was reasonable, "[t]he operative question . . . is 'whether the totality of the circumstances justifie[s] a particular sort of search or seizure.'" Id. (quoting Tennessee v. Garner, 471 U.S. 1, 8-9 (1985)). "The reasonableness of the use of force is evaluated under an 'objective' inquiry that pays 'careful attention to the facts and circumstances of each particular case.'" Id. (quoting Graham v. O'Connor, 490 U.S. 396 (1989)). "In assessing a claim of excessive force, courts ask 'whether the officers' actions are "objectively reasonable" in light of the facts and circumstances confronting them.'" Lombardo v. City of St. Louis, Mo., ___ U.S. ___, 141 S. Ct. 2239, 2241 (2021) (quoting Graham, 490 U.S. at 397). "Whether an officer has used excessive force depends on 'the facts and circumstances of each particular

case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'" Rivas-Villegas v. Cortesluna, ___ U.S. ___, 124 S. Ct. 4, 8 (2021) (quoting Graham, 490 U.S. at 396). Courts also consider "the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or limit the amount of force; the severity of the security problem at issue; [and] the threat reasonably perceived by the officer . . . ." Lombardo, 141 S. Ct. at 2241 (quoting Kingsley v. Hendrickson, 576 U.S. 389, 397 (2015)). "And '[t]he "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'" Mendez, 137 S. Ct. at 1546 (citing Graham, 490 U.S. at 396). "Excessive force claims . . . are evaluated for objective reasonableness based upon the information the officers had when the conduct occurred." Id. (quoting Saucier v. Katz, 533 U.S. 194, 207 (2001)).

The parties agree that Vander Steeg took Lux from a standing position to a prone position on the ground. They also agree that Zens forced Nettles up against the squad car with his face toward the car. They disagree—vehemently—over whether any force was needed and whether the force Vander Steeg used to take Lux to the ground and keep him there and the force Zens used to detain Nettles was reasonable under the circumstances.

The plaintiffs have alleged that they were just walking home, talking to Piper (a football teammate of Lux's), when Vander Steeg stopped and demanded

that they come over to him. The defendants say that Vander Steeg saw the men pushing each other—specifically, Lux pushing Piper. Talking to Stuppy and Vander Steeg after the incident, Piper appeared to agree that he was in physical danger, although arguably after Vander Steeg led him to that conclusion and having admitted that he was a minor and had been drinking. See dkt. no. 43-1. None of the cameras caught what happened prior to Vander Steeg pulling up to the men, and it is not up to the court to determine which version of events is more credible. Williams v. Stauche, 709 F. App'x 830, 835 (7th Cir. 2017) ("Questions of credibility are for the finder of fact, not the judge when ruling on a motion for summary judgment."). There is a genuine dispute over the material fact of whether there was a risk to Piper's safety that justified Vander Steeg's stop of the plaintiffs.

The parties also disagree on whether Lux and Nettles were resisting. Each side relies to some extent on the body cam recordings in support of its version of events—the plaintiffs to argue that they were not resisting, the defendants to argue that they were. The Supreme Court has held that "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." Scott v. Harris, 550 U.S. 372, 380 (2007). In Scott, the "record" that blatantly contradicted the respondent's version of events was a videotape. Id. at 380-81. But the body cam recordings do not "blatantly contradict" either party's version of events. Vander Steeg's body cam shows that the plaintiffs did

36

not immediately acquiesce to his orders to come to him and that Lux did not immediately comply with several orders that he put his hands behind his back. But it does not show Lux yanking away from Vander Steeg—in part, because Vander Steeg's body cam was not activated for the entire incident. In particularly, it does not show the moment that Vander Steeg took Lux to the ground, a point at which the plaintiffs claim that Lux was not resisting and that the defendants assert that he was.

Even the portions of the incident that were caught on video do not clearly capture what was happening. The parties dispute whether Vander Steeg put Lux face down in a puddle and then left, or held, him there for several minutes while Lux was handcuffed and struggling to breathe. Though the defendants argue that Lux's face was not directly in the puddle, and that he had freedom to move his neck and face, there are moments during which it appears that Lux was face-down in the water and moments during which the viewer can see him spitting water out of his mouth when he rolls over and where he appears to be panting and trying to catch his breath. Because the videos do not capture the entire incident, a viewer cannot tell whether Vander Steeg put Lux face-down in the water, whether he held him there, whether Lux's mouth and nose were submerged or for how long. And because the video does not capture what Lux did that allegedly justified Vander Steeg taking him to the ground, the court cannot determine whether Vander Steeg's holding Lux face-down in water was a reasonable response. There is a genuine dispute as to the material fact of

whether Vander Steeg's actions in taking Lux down and holding him down were reasonable under the circumstances.

The same is true regarding the force Zens used against Nettles. The footage shows Zens detaining Nettles as Nettles turned and took a step from the street where water is running onto the curb immediately next to him. Zens then immediately turned Nettles back around and pushed him up against the car. Nettles asserted that Zens used enough force to chip his front tooth and knock his glasses to the ground. Nettles says he was not resisting at all, and in the video he tells Zens that he was reaching for his glasses that had fallen in the puddle. The video also shows Zens stating that Nettles was resisting and yanking his arm away from Zens. Even though this incident was captured on video, the viewer cannot determine what Nettles was trying to do—get out of the water or get away from Zens—and whether the force Zens used was reasonable. There is a genuine dispute as to the material fact of whether Nettles was resisting and whether the force Zens used to prevent his perceived resistance was reasonable.

Finally, the defendants argue that Vander Steeg was concerned about his own safety given Lux's size and the fact that there were two defendants and only one of him before backup arrived. Because there is a genuine dispute of fact as to whether Lux was resisting, there is a genuine dispute as to whether a reasonable officer knowing all that Vander Steeg knew at the time would have perceived Lux and Nettles to be a threat.

A reasonable jury could conclude, based on the video and how they evaluated the witness's credibility, that the plaintiffs were not resisting, or that if they were, the force used by Vander Steeg and Zens was not reasonable under the totality of the circumstances, even from the perspective of a reasonable officer on the scene. The court will deny the defendants' motion for summary judgment as to Count Two.

4. *Count III – False Arrest*

The plaintiffs' third claim is that Vander Steeg and Zens did not have probable cause to arrest them and therefore that Vander Steeg and Zens subjected them to false arrest. Dkt. No. 29 at ¶¶66-68. The defendants argue that the plaintiffs' claims are barred under Heck v. Humphrey because the plaintiffs were later convicted of the crimes for which they were arrested. Dkt. No. 57 at 6. They also argue that they had probable cause to arrest the plaintiffs, which means that the plaintiffs cannot state a claim for false arrest. Id. at 6-9.

In Heck, the Supreme Court explained that §1983 "creates a species of tort liability," 512 U.S. at 483, quoting Memphis Cmty. Sch. Dist. v. Stachura, 477 U.S. 299, 305 (1986), and reasoned that "the hoary principle that civil tort actions are not appropriate vehicles for challenging the validity of outstanding criminal judgments applies to § 1983 actions that necessarily require the plaintiff to prove the unlawfulness of his conviction or confinement . . . ," 512 U.S. at 485. The Court held that

> in order to recover damages for allegedly unconstitutional conviction
> or imprisonment, or for other harm caused by actions whose

39

unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such a determination, or called into question by a federal court's issuance of a writ of habeas corpus, 28 U.S.C. § 2254. A claim for damages bearing that relationship to a conviction or sentence that has *not* been so invalidated is not cognizable under § 1983. Thus, when a state prisoner seeks damages in a § 1983 suit, the district court must consider whether a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence; if it would, the complaint must be dismissed unless the plaintiff can demonstrate that the conviction or sentence has already been invalidated. But if the district court determines that the plaintiff's action, even if successful, will *not* demonstrate the invalidity of any outstanding criminal judgment against the plaintiff, the action should be allowed to proceed, in the absence of some other bar to the suit.

Id. at 486-87.

To determine whether a §1983 suit that does not seek damages directly attributable to a conviction or to confinement might nonetheless be Heck-barred, the court asks whether, in order to prevail in on the §1983 claim, the plaintiff would "have to negate an element of the offense of which he has been convicted." Id. at 486 n.6. "Although a false-arrest claim does not necessarily imply the invalidity of a conviction, the *Heck* bar will apply if the plaintiff's allegations are inconsistent with guilt." Johnston v. Devries, No. 21-2679, 2022 WL 476088, at *2 (7th Cir. Feb. 16, 2022) (citing Mordi v. Zeigler, 870 F.3d 703, 708 (7th Cir. 2017)).

The plaintiffs each were cited for, and pled guilty to, "Disorderly Conduct—Objectionable Conduct." Dkt. No. 46-4 at 1, 4. The defendants argue that Whitewater Ordinance 7.36.020.4 provides in relevant part that

40

No person shall, within the limits of the City of Whitewater, commit any of the following offenses:

\* \* \*

(4) OBJECTIONABLE CONDUCT. Whoever, in a public or private place, engages in violence, abusive, indecent, profane, boisterous, unreasonably loud or otherwise disorderly conduct under the circumstances in which the conduct tends to cause or provoke a disturbance is guilty of a violation under this section.

Dkt. No. 57 at 8.

"To prevail on a false-arrest claim under § 1983, a plaintiff must show that there was no probable cause for his arrest." Neita v. City of Chi., 830 F.3d 494, 497 (7th Cir. 2016). To prevail on their false arrest claim, then, the plaintiffs would have to prove that the officers did not have probable cause to arrest them for disorderly/objectionable conduct—that the officers had no reason to believe that they had engaged in conduct that tended to provoke a disturbance in a public place. They would have to negate one—all, really—of the elements of the violations to which they pled guilty. Their allegations are inconsistent with their pleas of guilty on the disorderly/objectionable conduct violations. The plaintiffs' false arrest claims are Heck-barred.

The defendants also argue that under Seventh Circuit law, "if the Plaintiffs were convicted, regardless of whether they appealed, there [sic] false arrest claim cannot stand." Dkt. No. 57 at 6. They cite Tillman v. Conroy, 12 F.3d 1101 (7th Cir. 1992) and King v. Goldsmith, 897 F.2d 885, 886 (7th Cir. 1990). Neither of these cases stand for the proposition the defendants assert. Tillman involved a defendant who filed a §1983 suit alleging that his rights were violated when law enforcement and court officials did not acquire a

41

juvenile waiver order prior to trying him as an adult; it had nothing to do with, and does not mention, false arrest claims. The quote the defendants pull from Goldsmith—"[C]onviction bars a suit for false arrest or malicious prosecution *based on a claim that there was no probable cause to arrest the plaintiff.*"—is part of a longer discussion. The district court had granted summary judgment in favor of police officers "on the ground that, at common law, conviction precludes a subsequent suit by the defendant charging law enforcement officers with false imprisonment or malicious prosecution." Goldsmith, 897 F.2d at 886. The Seventh Circuit cited a Second Circuit case that had applied that principle in a §1983 suit, and assumed without deciding that the case was decided correctly. Id. The court then said, "Even so, all [the Second Circuit case] holds is that conviction bars a suit for false arrest or malicious prosecution *based on a claim that there was no probable cause to arrest the plaintiff.*" Id. The court then went on to discuss the narrow nature of such a holding and how it did not bar re-litigation of guilt if a conviction is procured by fraud. Id. at 886-87. The court has found no authority in this circuit stating that a conviction is an absolute bar to a false arrest claim.

Because the plaintiffs' false arrest claims are Heck-barred, the court will grant summary judgment in favor of the defendants as to Count Three.

### 5.    *Count IV – Failure to Intervene*

The plaintiffs' fourth claim is that Vander Steeg, Zens and Johnson failed to intervene to prevent each other from violating the plaintiffs' rights,

42

specifically Lux lying with his face in a puddle and Nettles being slammed into the squad car. Dkt. No. 29 at ¶¶75-81.[6]

To succeed on a claim for failure to intervene, the plaintiffs must show that the defendants "(1) knew that a constitutional violation was committed; and (2) had a realistic opportunity to prevent it." Gill v. City of Milwaukee, 850 F.3d 335, 342 (7th Cir. 2017) (citing Yang v. Hardin, 37 F.3d 282, 285 (7th Cir. 1994)). "[A] 'realistic opportunity' means a chance to warn the officer using excessive force to stop." Miller v. Gonzalez, 761 F3d 822, 826 (7th Cir. 2014) (citing Abdullahi v. City of Madison, 423 F.3d. 763, 774 (7th Cir. 2005).

There are genuine disputes of material fact regarding whether Vander Steeg and Zens violated the plaintiffs' Fourth Amendment rights by subjecting them to excessive force, including the force used by Vander Steeg to move Lux to the ground and leave him in a puddle and the force used by Zens to push Nettles up against the squad car. The question for the failure-to-intervene claims is whether there is any evidence that each was aware of what the other was doing and had a "realistic" opportunity to warn the other to stop.

Vander Steeg testified at his deposition that he was not sure when Zens arrived on the scene—he was not sure whether Lux was standing up or already on the ground when Zens arrived. Dkt. No. 46-1 at 21, Tr. Page 79 at lines 11-18. He testified, however, that Zens was helping him while Lux allegedly was on the ground resisting. Id. at Tr. Page. 79, lines 19-25; Tr. Page 80 at lines 1-14.

---

[6] Johnson filed for summary judgment separately from Steeg, Zens and Stuppy, dkt. no. 36; the court addresses his arguments in a separate order.

43

Nettles stated in his declaration that Lux's face was in the puddle when Zens was present and that Zens even held onto Lux while Lux was face-down in the puddle and was not resisting. Dkt. No. 63 at ¶¶38, 40. Vander Steeg also testified that he observed Zens's interactions with Nettles. Dkt. No. 46-1 at 22, Tr. Page 82 at lines 19-25; Tr. Page 83 at lines 1-25; Tr. Page 84 at lines 1-25. Vander Steeg testified that he "helped out" with taking Nettles into custody. Id. at Tr. Page 84 at lines 18-23; 23 at Tr. Page 85, lines 11-14; Tr. Page 86. As indicated, Vander Steeg's video stopped before much of what he described in his deposition occurred.

Although Zens's video appears to show Lux on the ground with his face down when Zens arrived at the scene, dkt. no. 61-2, Zens testified at his deposition that Lux was still standing when he arrived on the scene. Dkt. No. 46-2 at 6, Tr. Page 19 at lines 16-17; Tr. Page 20 at lines 2-16. Zens testified that he was present when Vander Steeg "decentralized" Lux. Id. at Tr. Page 20 at lines 24-25; 7, Tr. Page 21 at lines 13-25. Later, he stated that he never saw how Lux made it to the ground. Id. at Tr. Page 22, lines 1-25. Zens testified that he assisted Vander Steeg with Lux. Id. at Tr. Page 24. He testified that Vander Steeg was present during his interactions with Nettles. Id. at 9, Tr. Pages 29-32. But Zens said that he did not recall Vander Steeg helping him with Nettles. Id. at 10, Tr. Page 35 at lines 7-11.

As the court concluded regarding the excessive force claim, there are genuine disputes as to issues of fact regarding whether Zens could have intervened to stop Vander Steeg's alleged use of excessive force against Lux,

and whether Vander Steeg could have intervened to stop Zens's alleged use of excessive force against Nettles. Both were present during the other's interactions with the plaintiffs. The video record does not provide a complete picture of what occurred. Even when it does capture portions of the incident, it is difficult to determine exactly what is happening. Depending on how a jury viewed the evidence and the testimony, it could conclude that one or both of the officers could have yelled at the other to stop what they were doing or walked over to the other and attempted to intervene.

The court will deny summary judgment as to Vander Steeg and Zens on the failure-to-intervene claim.

6. *Count V – <u>Monell</u> Municipal Liablity*

The plaintiffs allege that the officers unlawfully arrested them and used excessive force against them under "Whitewater and its Police Department's de-facto policy, regulation, decision or custom condoning excessive force in executing arrests [and] false arrests . . .," and due to "Whitewater and [Chief] Raap's failure to adequately discipline the Defendant officers for such violations." <u>Id.</u> at ¶86.

Section 1983 prohibits a "person" acting under color of law from violating another's civil rights. The Supreme Court held in <u>Monell</u>, 436 U.S. at 690, however, that Congress intended municipalities and local governments to be included in the definition of "persons" "where . . . the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's

45

officers." The <u>Monell</u> Court also held that a municipality could be sued "for constitutional deprivations visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decisionmaking channels." <u>Id.</u> But "[m]unicipal liability under *Monell* carries an important limitation: the statute does not incorporate the common-law doctrine of respondeat superior, so a municipality cannot be held liable for the constitutional torts of its employees and agents." <u>First Midwest Bank Guardian of Estate of La Porta v. City of Chicago</u>, 988 F.3d 978, 986 (7th Cir. 2021) (citing <u>Monell</u>, 436 U.S. at 690-91). "[T]o prevail on a § 1983 claim under *Monell*, a plaintiff must challenge conduct that is properly attributable to the municipality itself." <u>Id.</u> (citing <u>Bd. of Cty. Comm'rs v. Brown</u>, 520 U.S. 397, 403-04 (1997)). The Seventh Circuit has identified three types of actions that can support municipal liability under §1983:

> "(1) an express policy that causes a constitutional deprivation when enforced; (2) a widespread practice that is so permanent and well-settled that it constitutes a custom or practice; or (3) an allegation that the constitutional injury was caused by a person with final policymaking authority." *Spiegel v. McClintic*, 916 F.3d 611, 617 (7th Cir. 2019) (quotation marks omitted).

<u>Id.</u>

A plaintiff asserting a <u>Monell</u> claim must prove that the policy or custom "demonstrates municipal fault." <u>Id.</u> (citing <u>Brown</u>, 520 U.S. at 404). <u>Monell</u> liability is "difficult to establish," requiring the plaintiffs to "prove that a municipality, either through an express policy or an implied policy of inaction, took 'deliberate' action that was the 'moving force' behind a constitutional injury." <u>Taylor v. Hughes</u>, 26 F.4th 419, 435 (7th Cir. 2022) (quoting <u>Brown</u>,

46

520 U.S. at 403-07). In a case like this one, where the plaintiffs have alleged that the municipality caused its employees to violate their rights, "a 'rigorous standard[] of culpability . . . applie[s] to ensure that the municipality is not held liable solely for the actions of its employee.'" La Porta, 988 F.3d at 986-87 (quoting Brown, 520 U.S. at 405.

> In this situation, the plaintiff must demonstrate that the municipality's action "was taken with 'deliberate indifference'" to the plaintiff's constitutional rights. [*Brown*, 520 U.S.] at 407 . . . . This is a high bar. Negligence or even gross negligence on the part of the municipality is not enough. *Id.* A plaintiff must prove that it was obvious that the municipality's action would lead to constitutional violations and that the municipality consciously disregarded those consequences. *Id.*
>
> Finally, a *Monell* plaintiff must prove that the municipality's action was the "moving force" behind the federal-rights violation. *Id.* at 404 . . . . Like the heightened showing of municipal fault, this rigorous causation standard guards against backsliding into respondeat superior liability. *Id.* at 405 . . . . To satisfy the standard, the plaintiff must show a "direct causal link" between the challenged municipal action and the violation of his constitutional rights. *Id.* at 404 . . . .
>
> These requirements—policy or custom, municipal fault, and "moving force" causation—must be scrupulously applied in every case alleging municipal liability.

Id. at 987.

The amended complaint alleged that the city of Whitewater and its police department had a "de-facto policy" of "condoning excessive force in executing arrests, false arrests and/or otherwise violating person's equal protection rights, including by the City's or in this case to date, Defendant Whitewater and Raap's failure to adequately discipline the Defendant officers for such violations." Dkt. No. 29 at ¶86. It alleged that "[t]his official or defacto policy or

47

custom of utilizing excessive force and/or violating person's equal protection rights permitted encouraged, tolerated and ratified the actions of Defendants Vander Steeg, Stuppy, and Zens . . . by, among others, the Defendant Whitewater and Raap's failure to adequately discipline the officers for their unlawful conduct and not just for failing to supervise the situation." Id. at ¶87. Finally, the amended complaint alleged that the "official or defacto policy and custom of utilizing excessive force and/or violating person's equal protection rights arose and/or was allowed to continue as a result of, among others the Whitewater a police department's [sic] failure to adequately supervise, discipline, and/or train its employees;" the amended complaint asserts that

> [u]pon information and belief, some or all of the individual Defendants and other Whitewater Police officers had previously forced individuals to the ground in an unjustified and excessive manner or had executed arrests against individuals in an unjustified manner, without being adequately disciplines [sic] and/or properly trained.

Id. at ¶88.

The plaintiffs have not remotely come close to showing the "rigorous standard" of culpability required to prove a Monell claim. They have presented no evidence of an express policy. They have provided no proof of a widespread practice of excessive force or false arrest—either involving Vander Steeg and Zens or involving any other Whitewater officers—such that it could imply a custom or practice. They have presented no proof that the alleged constitutional violations committed by Vander Steeg and Zens were caused by someone with final policymaking authority. Because they have not identified a policy, custom or practice, the plaintiff cannot show that it was obvious that

48

such a policy, custom or practice would lead to constitutional violations. And they cannot prove that any policy, custom or practice caused the violations that the plaintiffs allege.

The plaintiffs have not presented any evidence to support their allegations that the municipality has not disciplined Vander Steeg and Zens, but even if they had, failure to discipline two officers involved in a single incident (assuming that discipline was warranted) does not establish a pattern or practice of turning a blind eye to constitutional violations committed by officers. To prove a Monell claim, the plaintiffs must show "That there is a policy at issue rather than a random event." Thomas v. Cook Cty. Sheriff's Dept., 604 F.3d 293, 303 (7th Cir. 2010). The plaintiffs have not presented any evidence to support their allegations that the municipality failed to train officers. "A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." Connick v. Thompson, 563 U.S. 51, 61 (2011). "[A] municipality's failure to train its employees in a relevant aspect must amount to 'deliberate indifference to the rights of the persons with whom the [untrained employees] come into contact.'" Id. (quoting City of Canton, Ohio v. Harris, 489 U.S. 378, 388 (1989)). The defendants have presented evidence that officers receive extensive training; the plaintiffs have presented no evidence to the contrary. They have not even alleged how they believe officer training is deficient or how the city ought to have trained differently or better.

49

Thus, there is no genuine dispute of material fact that Whitewater or Chief Rapp had a policy, custom or practice that was at fault for and was the moving force behind the alleged constitutional violations. The court will grant the defendants' motion for summary judgment as to Count Five.

### 7.    *Count VI – Punitive Damages*

Finally, Count Six of the amended complaint alleges that that the defendants' conduct was "unlawful, extreme, malicious, outrageous and/or intentional," and that they "acted maliciously and/or with reckless disregard and/or with deliberate indifference toward Mr. Lux and Mr. Nettles or in an intentional disregard of their rights, such as to subject all Defendants to punitive damages." Id. at ¶¶92, 95. The defendants argue that the plaintiffs are not entitled to punitive damages.

"In an action under § 1983, 'a jury may be permitted to assess punitive damages . . . when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others.'" Green v. Howser, 942 F.3d 772, 781 (7th Cir. 2019) (quoting Smith v. Wade, 461 U.S. 30, 56 (1983)).

The plaintiffs have presented evidence that could support a jury finding that Vander Steeg and/or Zens used excessive force and that they failed to intervene in the use of such force by others. They have offered evidence showing that both Lux and Nettles suffered physical injury by the officers' conduct and that Lux's face remained in a puddle for an extended period of time as he told officers he was struggling to breathe. Dkt. No 62 at ¶39-40, 43;

50

dkt. no. 61-3 at 3:26-3:40; id. at 1:55-2:00; dkt. no. 61-2 at 1:55-2:02; dkt. no. 63 at ¶50. Additionally, the plaintiffs insist that the officers prevented Nettles from filming their treatment of Lux. Dkt. No. 62 at ¶44; dkt. no. 63 at ¶¶38, 41. If a jury were to find in favor of the plaintiffs on the liability claims, that jury could conclude that the officers acted with reckless or callous indifference to the plaintiffs' rights. The court will not dismiss the punitive damages demand.

### 8.    *Qualified Immunity*

The defendants assert that they are entitled to qualified immunity. "Qualified immunity shields a government official from suit when the official is performing a discretionary function and his conduct does not violate clearly established rights of which a reasonable person would have known." <u>Sutterfield v. City of Milwaukee</u>, 751 F.3d 542, 572 (7th Cir. 2014). "To be 'clearly established,' a constitutional right 'must have a sufficiently clear foundation in then-existing precedent.'" <u>Campbell v. Kallas</u>, 936 F.3d 536, 545 (7th Cir. 2019) (quoting <u>District of Columbia v. Wesby</u>, 138 S. Ct. 577, 589 (2018)). "Qualified immunity applies unless the specific contours of the right 'were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it.'" <u>Id.</u> (quoting <u>Plumhoff v. Rickard</u>, 572 U.S. 765, 778-79 (2014)). Clearly established law "cannot be framed at a 'high level of generality.'" <u>Id.</u> (quoting <u>Ashcroft v. al-Kidd</u>, 563 U.S. 731, 742 (2011)).

> Whether qualified immunity applies turns on two questions: First, whether the facts presented, taken in the light most favorable to the plaintiff, describe a violation of a constitutional right; and second, whether the federal right at issue was clearly stablished at the time of the violation. *Tolan v. Cotton*, 572 U.S. 650, 655-56 . . . . (2014) (per curiam). These questions may be addressed in either order.

51

> *Jones* [*v. Clark*], 630 F.3d [677] at 682 [7th Cir. 2011]] (citing *Pearson v. Callahan*, 555 U.S. 223, 236-43 . . . (2009)). 'If *either* inquiry is answered in the negative, the defendant official is protected by qualified immunity." *Koh v. Ustich*, 933 F.3d 836, 844 (7th Cir. 2019) (citation and internal quotation marks omitted).

Smith v. Finkley, 10 F.4th 725, 737 (7th Cir. 2021).

"The question of a defendant's qualified immunity is a question of law for the court, not a jury question." Id., 10 F.4th at 734 (quoting Warlick v. Cross, 969 F.2d 303, 305 (7th Cir. 1992)).

The court has concluded that the facts, viewed in the light most favorable to the plaintiffs, describe a possible violation of a constitutional right—the Fourth Amendment's prohibition against the use of excessive force in effecting a seizure. As to whether that constitutional right was clearly established at the time of the incident, the court must determine whether "precedent squarely governs the facts at issue, mindful that [it] cannot define clearly established law at too high a level of generality." Id. at 742 (quoting Strand v. Minchuk, 910 F.3d 909, 917 (7th Cir. 2018)). In excessive force cases, defining the "clearly established right" with specificity is important, "as it can be difficult to determine how the law on excessive force will apply to a factual situation," given the heavily fact-intensive nature of excessive force claims. Id. An official "cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." Kisela v. Hughes, ___ U.S. ___, 138 S. Ct. 1148, 1153 (2018) (quoting Plumhoff, 134 S. Ct. at 2023).

Since at least 2007, it has been clearly established that "a police officer may not use excessive force in arresting an individual." Holmes v. Vill. of Hoffman Estate, 511 F.3d 673, 687 (7th Cir. 2007). Since at least 1995, it has been clearly established "that using a significant level of force on a non-resisting or a passively resisting individual constitutes excessive force." Alicea v. Thomas, 815 F.3d 283, 292 (7th Cir. 2016) (citing Rambo v. Daley, 68 F.3d 203, 207 (7th Cir. 1995)). See also Miller v. Gonzalez, 761 F.3d 822, 829 (7th Cir. 2014) ("the law is clearly established that police officers cannot use 'significant' force on suspects who are only passively resisting arrest").

While there are genuine disputes as to whether the plaintiffs were resisting and whether the force Vander Steeg and Zens used—if any—was reasonable, the court concludes that the law was clearly established that officers could not use excessive force in effecting an arrest, and that the record contains evidence indicating that they may have done so. The defendants are not entitled to qualified immunity.

## III. Conclusion

The court **GRANTS** defendant Stuppy's motion for summary judgment as to all claims against him. Dkt. No. 40.

The court **GRANTS** the defendants' motion for summary judgment on Count One, Count Three and Count Five. Dkt. No. 40.

The court **DENIES** the defendants' motion for summary judgment on Count Two and Count Four as to defendants Vander Steeg and Zens. Dkt. No. 40.

The court **DENIES** the defendants' motion to strike the plaintiffs' request for punitive damages. Dkt. No. 40.

The court **FINDS** that the defendants are not entitled to qualified immunity. Dkt. No. 36.

The court **ORDERS** that defendants City of Whitewater, Aaron Raap and Justin Stuppy are **DISMISSED**.

The court will schedule a status conference to discuss with the parties the next steps in the litigation.

Dated in Milwaukee, Wisconsin this 28th day of September, 2022.

BY THE COURT:

HON. PAMELA PEPPER
Chief United States District Judge

Case 2:20-cv-01057-PP   Filed 09/28/22   Page 54 of 54   Document 76